**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**DEVONIAN GAS AND OIL COMPANY, J. Cordell Moore, C. Walter Harris, Tom Black, Estate of Andrew W. Robertson, M. L. McCullough, Christopher W. Hurley, and Frederick J. Meyer, Defendants-Appellants.**

**No. 365, Docket 34067.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1969.

Decided Jan. 26, 1970.

On Rehearing April 8, 1970.

---

George R. Hyde, Atty., Dept. of Justice, Washington, D. C. (Shiro Kashiwa, Asst. Atty. Gen., H. Kenneth Schroeder, Jr., U. S. Atty., C. Donald O'Connor, Asst. U. S. Atty., Buffalo, N. Y., S. Billingsley Hill and William F. Smith, Attys., Dept. of Justice, Washington, D. C., of counsel), for plaintiff-appellee.

Stephen H. Kelly, Buffalo, N. Y. (Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., and John E. Dickinson, Buffalo, N. Y., of counsel), for defendants-appellants.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from an order of the District Court for the Western District of New York requires interpretation of § 5 of the Seneca Leasing Act of 1950, 64 Stat. 442, as applied to oil and gas leases executed by the Seneca Nation to the defendants in 1955. Although the question is close, our conclusion differs from that of the district court.

Some historical background is needed to place the issue in focus: Of their once vast holdings in Western New York, the Senecas have retained only three reservations in the southwestern part of the State. Our concern is with the Allegany reservation. Prior to 1875 the Seneca Nation had granted leases to settlers within certain "villages" in that reservation, and the New York Legislature, apparently acting under Article I, § 13 of the New York Constitution, see fn. 3 *infra*, had purported to ratify these at various times. See, e. g., N.Y. Laws 1866, Chs. 263 and 462. After a state court held that the exclusive power to permit leases of reservation land was in the United States,[1] see 25 U.S.C. § 177, New York persuaded Congress to ratify the existing leases and authorize new ones within the "villages" for up to 12 years, 18 Stat. 330 (1875), later extended to 99, 26 Stat. 558 (1890). Many of the leases were in what is now the

---

1. The decision, by a New York Supreme Court judge, is unreported, but its effect is set out in a resolution of the N.Y. Legislature printed in N.Y.Laws 1875, at 819, and reprinted in H.R.Misc.Doc. No. 75, 43d Cong., 2d Sess. (1875).

City of Salamanca, where an Indian Agent was in residence to collect the rents. See United States v. Forness, 125 F.2d 928 (2 Cir. 1942). In 1949 New York authorized the City to collect these. and required it to pay them, whether or not collected, "to such person, officer, agency or organization as may be designated by or pursuant to act of congress." N.Y.Laws 1949, ch. 787. Mineral leases outside the villages were governed by the Federal Act of May 11, 1938, 52 Stat. 347, applicable to Indian tribes in general, which authorized leases "for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities," subject, however, to a requirement of competitive bidding and other protections.

The first four sections of the Seneca Leasing Act of 1950, 64 Stat. 442, were the federal counterpart of the 1949 New York legislation relating to the Salamanca leases. They eliminated the participation of a Federal Indian Agent in the collection process, authorized the Treasurer of the Seneca Nation to receive payments from the City, required him to post security, and provided for distribution of the proceeds among the members. Sections 5 and 7, with which we are concerned, provided as follows:

Sec. 5. In addition to the authority now conferred by law on the Seneca Nation of Indians to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations to railroads and to lease lands within the limits of the villages established under authority of the Act of February 19, 1875 (18 Stat. 330), the Seneca Nation of Indians, through its council, is authorized to lease lands within the Cattaraugus, Allegany, and Oil Springs Reservations, outside the limits of such villages, for such purposes and such periods as may be permitted by the laws of the State of New York.

Sec. 7. All Acts or parts of Acts inconsistent with this Act are hereby repealed.

In 1955 the defendants entered into oil and gas leases with the Seneca Nation for land within the Allegany reservation for terms of ten years and as long thereafter as oil or gas was produced in paying quantities. There was no competitive bidding, but it is not contended that the leases were unfair. Six years later the New York State Joint Legislative Committee on Indian Affairs rendered a report to the Legislature. In the course of extensive discussion of the entire problem of the leasing of Indian lands, the report recited, p. 8:

Until the present legislative session, the Seneca Nation of Indians had presented no request for legislation to implement the authorization granted by the August 14, 1950 Act of Congress. A bill now pending does, however, seek approval for leases up to ten years in duration.

Report of the N.Y.Joint Legis. Comm. on Indian Affairs, Legis.Doc. No. 28 (1961). The Committee recommended enactment of a bill, prepared by counsel for the Seneca Nation in line with a vote of the Seneca Council on March 26, 1960, authorizing leases "for a term not to exceed ten (10) years." This was enacted, effective April 17, 1961, N.Y. Laws 1961, ch. 702, N.Y.Indian Law § 78.

These actions were filed by the United States in 1963 for the taking of property, including that subject to defendants' leases, for the Allegheny River Reservoir project. In 1964 arrangements were made for substantial payments to the Seneca Nation and individual Indians, see 78 Stat. 738.[2] The United States then moved for summary judgment determining that the leases were invalid. After proceedings unnecessary to detail, the court granted such judgment and this appeal followed.

2. The Senecas had fought to stop the project but lost, see Seneca Nation of Indians v. Brucker, 104 U.S.App.D.C. 315, 262 F.2d 27 (1958), cert. denied, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959).

Two points about the statute seem completely clear. One is that federal control of leasing was withdrawn; the other is that New York control was allowed. Beyond this we enter a vale of ambiguity. The United States contends and the district judge held that the final clause of § 5 of the Seneca Leasing Act, "for such purposes and such periods as may be permitted by the laws of the State of New York," means "as may be specifically permitted." Defendants say it means "as shall not be prohibited."[3] Since the words are reasonably susceptible of either meaning, we must look elsewhere for help. "Where the mind labors to discover the design of the legislature, it seizes every thing from which aid can be derived." United States v. Fisher, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C. J.).

In the form in which it was introduced in the House and Senate, the Seneca Leasing Act authorized leasing outside the villages for periods not exceeding ten years, without reference to purposes or to the laws of New York. On August 8, 1949, while the bill was being considered by the House Committee on Public Lands and the Senate Committee on Interior and Insular Affairs, the Undersecretary of the Interior wrote to the Chairman of each committee:

Section [5] does not specify the purposes for which leases may be made and limits the period of any lease to not exceeding ten years. This period may be too short particularly as to mineral or other leases requiring extensive development. I believe that Section [5] should be amended by striking from lines 4 and 5, page 3, the words "for periods not to exceed ten years" and inserting in lieu thereof the words "for such purposes and for such periods as may be permissible under the laws of the State of New York."

One day later, on August 9, 1949, the bill was reported out of the House Committee with the amendment in the form recommended by the Undersecretary, save only for a change of "permissible under" to "permitted by." H.R.Rep. No. 1238, 81st Cong., 1st Sess. (1949). It was adopted in that form by the House on May 1, 1950, 96 Cong.Rec. 6093, and referred to the Senate the next day, 96 Cong.Rec. 6122. On July 19, 1950, the Senate Committee issued its report, recommending passage with amendments not here relevant, S.Rep.No. 2105, 81st Cong., 2d Sess. (1950).[4] The

---

3. The United States argues also that the leases are invalid even under defendants' construction of § 5, since Article I, § 13, of the New York Constitution (repealed effective January 1, 1963, but replaced by a similar statute, N.Y. Indian Law, McKinney's Consol.Laws, c. 26, § 7–a), provided:

No purchase or contract for the sale of lands in this state, made since the fourteenth day of October, one thousand seven hundred seventy-five; or which may hereafter be made of, or with the Indians, shall be valid unless made under the authority, and with the consent of the legislature.

This provision derives from the Constitution adopted by New York in 1777, during the Confederation. We do not find the argument persuasive. Any function originally served by this provision was long since taken over by the Act of June 30, 1834, § 12, 4 Stat. 730, later Rev. Stat. § 2116 and now 25 U.S.C. § 177, "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." See Gunther, Government Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal-State Relations, 8 Buff.L.Rev. 1, 22–23 (1958). It does not seem likely that in taking Seneca leasing out of 25 U.S.C. § 177—a statute that also invalidated "purchases"—anyone thought that such leasing would be altogether prohibited by a hoary New York constitutional provision long *functus officio*, which forbade purchases and contracts for the sale of Indian lands but did not mention leases.

4. The Senate Report states: "The bill will increase the authority of the said council to make leases of reservation land outside of the said villages for periods of not longer than 10 years." Probably this had

following week the bill was passed by the Senate, 96 Cong.Rec. 11075, and shortly therafter the House accepted the Senate amendments, 96 Cong.Rec. 11383.

Appellants rely on two statements, one made in the House and the other in the Senate. Representative Morris of Oklahoma said in moving passage of the bill:

> * * * it is a move in the general direction in which we all want to move, and that is in the direction of eventually assimilating all of the good Indian people in our country into our society so that they will no longer be wards of the Government.

96 Cong.Rec. 6089. Senator Ives of New York made a similar point:

> This legislation represents a further step in the direction of assumption by the Indians of the full responsibilities of citizenship. Its enactment would be a furtherance of the announced congressional policy withdrawing Federal supervision, wherever possible, and of placing management of tribal affairs in the hands of the Indians.

96 Cong.Rec. 11076.

Representative Morris' statement appears to have been aimed at the new rent collection procedures rather than at the section pertaining to additional leasing authority. Indeed, this was the gist of the entire discussion on the House floor, with one member voicing opposition to the bill on the ground that the Senecas could not trust the City of Salamanca. 96 Cong.Rec. 6088–93. Senator Ives's remarks on their face are somewhat more persuasive for the appellants' position, since, although he also concentrated on rent collection, his statement about "placing management of tribal affairs in the hands of the Indians" was

intended to apply to the entire bill rather than only to the first four sections. On the other hand, his statement was inserted into the Record only after the bill was passed.

A further datum in favor of appellants' interpretation comes from related legislation concerning the Indians of New York. The Acts of July 2, 1948, 62 Stat. 1224, and of September 13, 1950, 64 Stat. 845, now 25 U.S.C. §§ 232 and 233, relinquished the criminal and civil jurisdiction of the United States over New York Indians. The Commissioner of Indian Affairs said of these:

> The criminal and civil jurisdiction acts were part of an overall plan to withdraw Federal services to the Indians in New York and place the Indians in the same status as other citizens there.

Quoted in Letter from Acting Deputy Solicitor, Dep't of Interior, to the Attorney General, June 21, 1954.

Recognizing the importance of the construction given a statute by the agency concerned with its effect, see Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), appellants also cite two instances, in 1956 and 1960, in which the Bureau of Indian Affairs disclaimed any power with respect to leases by the Senecas and said that these were handled directly by the representatives of the Nation. While it can be argued that this means only that the federal government had no role to play with respect to leasing, not that the Senecas could grant leases in the absence of specific legislation from New York, the letters would have been rather misleading if the latter were not the Bureau's position.[5]

---

been written with reference to S.1947, which had been introduced simultaneously with H.R. 4942, and was not revised to take account of the amendment recommended by the Interior Department and adopted by the House in the bill to which the Senate Report was addressed.

5. The Departmental files unearthed by the diligence of appellants' able counsel dis-

credit the *post litem motam* opinion of the Deputy Commissioner of Indian Affairs dated February 5, 1965, that Seneca leases remained subject to the 1938 Federal Act—a position unsustainable in any view. The Deputy Assistant Commissioner for Economic Development correctly said in a pencilled comment on the routing slip that "this is circumlocution and a reversal of prior Bureau position."

The United States relies heavily on the Report of the New York Joint Legislative Committee on Indian Affairs which we have previously cited. Apart from the point that the intention of the 1950 Congress can only dubiously be inferred from the views of the Senecas and a committee of the New York Legislature a decade later, we think that when the Report and the Senecas' endorsement of the legislation proposed therein are carefully analyzed, they give more support to the lessees than to the United States.

The Government points to a Resolution of the Seneca Nation in March 1960, favoring passage of what is now § 78 of the N.Y.Indian Law. The relevant paragraphs are:

> AND WHEREAS: The Seneca Nation of Indians has had the right under [the Seneca Leasing Act] passed by the Congress of the United States and approved on August 14, 1950, to regulate leases and rights of ways to Tribal Lands;

> BE IT THEREFORE RESOLVED That this Council of the Seneca Nation of Indians duly convened in special session on March 26, 1960, does hereby oppose the proposed legislation regarding the leasing and granting of rights of ways on lands of the Seneca Nation; [6]

> AND BE IT FURTHER RESOLVED, That the Council of the Seneca Nation favors enactment of a Bill by the New York State Legislature providing that the Seneca Nation through its Council may grant leases or rights of ways on private lands and tribal interest in lands for periods up to ten years duration.

■■ The Resolution, in light of the preamble, can hardly be read otherwise than as an assertion of authority to grant leases under the 1950 Act without need for New York's permission—the very position taken by the Seneca Nation, on the advice of counsel, when it granted the leases here at issue. Against this is the argument that if the Seneca Nation believed it already had unrestricted power to grant leases, it would hardly have supported a New York law limiting the terms to ten years. The argument is not convincing. The Senecas knew that New York Indian legislation was in the offing in 1960. With this in mind, they may have though it better to get a special law acceptable to them rather than risk being swept within more restrictive legislation, see fn. 6. Besides, the Senecas had something to gain from enactment of § 78, since, as proposed and passed, that section expanded the Senecas' authority to deal with their lands by "authorizing" them to grant rights of way in addition to leases.[7] Beyond this the Seneca Nation could well have wished to be somewhat restrained in its power to lease tribal lands. The New York Joint Legislative Committee noted that the Tuscarora Nation opposed a proposed federal bill because "that nation 'does not now have the power and does not want the power to lease or grant rights of way over tribal lands.'" Report at 9. An Indian tribe is analogous to a separate nation, see Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) (Marshall, C. J.); McLane, Oil & Gas Leas-

---

6. The gist of this legislation, which was not enacted, is given on page 9 of the Report:

   Under the proposed State law all lease applications would be investigated by the Director of Indian Services whose duty it would be, following such investigation, to render a report to the County Judge * * *. Such officer, after reviewing the report and any further investigation deemed necessary by him, would approve or disapprove the application.

7. The Seneca Leasing Act did not authorize this and New York, of course, could not grant this additional authority without congressional approval. Congress responded by an amendment to the Leasing Act, adding "or grant easements or rights-of-way on" after "to lease." Act of Sept. 14, 1961, § 2, 75 Stat. 499.

ing on Indian Lands §§ 24–25 (1955), and citizens of nations often desire to restrict the actions of their governments. In this light, it seems not at all strange that the Senecas should have endorsed the enactment of § 78 of the N. Y.Indian Law even though this restricted the leasing authority they had theretofore possessed.

The letter of counsel for the Senecas in favor of what is now § 78 likewise does not support the interpretation of the Seneca Leasing Act advocated by the United States. He said that the proposed statutes would "fit within the framework" of the 1950 Act, and so it did since there is no doubt that the Act authorized New York to put limits on the Senecas' leasing powers. He also noted that the Senecas "do not wish authority to lease lands for any period longer than ten years," but that can be explained on the basis just discussed. Moreover, later in the same letter, he proposed a "savings clause which preserves the power of the Seneca Nation to enter into leases under the 1950 Act," a remark leaving the impression that the Senecas believed they had pre-existing power to grant leases.

Thus there remains only the statement in the Report that no request had earlier been presented "for legislation to implement the authorization granted by the August 14, 1950 Act of Congress." But this could well mean the authorization granted to New York to enact a Seneca leasing law, a law which New York could not have enacted without congressional approval, see U. S. Dep't of Interior, Federal Indian Law 501–10 (1966), rather than a leasing authorization needed by the Senecas.

█ In light of all this, we return to the question with which we began. We start with the firm proposition that the bill as originally introduced did not con-template "implementing" legislation by New York as a condition precedent to Seneca leasing within the prescribed period of 10 years; New York "laws" were not even mentioned. We then add that the "permitted by the laws of New York" amendment was a direct result of the recommendation in the Undersecretary's letter, sent just one day before the amendment was adopted by the House Committee, and that the purpose of the amendment was to *expand* rather than *contract* the Senecas' leasing authority. The Undersecretary's worry was that 10 years might be too short for "mineral or other leases requiring extensive development." We then must ask ourselves whether any rational purposes were served by reference to New York law, short of the position of the United States that until New York acted the Senecas could not lease at all.[8] We find several. While the purpose of the amendment was to expand leasing authority, there was no reason to expand it so much that the Senecas would be put in a better position than other New York citizens. It is doubtful that the Undersecretary or the House Committee had anything but a very general notion of what New York leasing law was, although they may have had some knowledge of "widespread State legislation outlawing long-term agricultural leases." Federal Indian Law, *supra*, at 691. Moreover, there was always the possibility that New York might enact legislation restricting the term of leases generally and Congress could have wished to make clear that it did not intend to preclude such legislation covering the Senecas as well as other New York citizens. As to leasing "purposes" similar ideas might have been in mind. In addition to considering leases for certain purposes illegal, see N.Y.Real Property Law McKinney's Consol.Laws, c. 50 § 231, N. Y.Penal Law, McKinney's Consol.Laws,

8. As heretofore indicated, we think the Government's further position that the grant of mineral leases by the Seneca Nation continued to be governed by the 1938 statute until New York acted is untenable under any reading. The Seneca Leasing Act took the Seneca Nation out of federal protection then and there, see § 7, as the Bureau of Indian Affairs recognized before this litigation began.

c. 40, § 230.40, New York had extensive regulations on the mining of gold and silver, requiring among other things notice to the Secretary of State and payment of royalties on the ore extracted. N.Y.Public Lands Law, McKinney's Consol.Laws, c. 46, § 82. Finally, and most important of all, it was essential to make clear that New York *could* put limits on the terms of leasing by the Senecas, as it ultimately did in 1961. With all these reasons motivating a reference to New York law, it is far more reasonable to read § 5 as meaning "as shall not be prohibited" rather than as requiring specific implementation by New York, a construction which would mean that the Seneca Nation was without power to lease from 1950 until 1961, see fn. 8.

The order granting summary judgment to the United States is reversed.

### On Petitions for Rehearing

### PER CURIAM.

Subsequent to our decision of January 26, 1970, the Seneca Nation of Indians sought and was granted leave to intervene in order to present what was called a petition for rehearing. In fact the petition does not challenge our decision but objects to certain statements in the opinion that the Seneca Leasing Act of 1950, 64 Stat. 442, terminated the right of the Senecas to make leases in accordance with general federal Indian leasing laws. On the Senecas' view the repealer provision, § 7, referred only to the earlier Seneca Leasing Acts, 18 Stat. 330 (1875) and 26 Stat. 558 (1890), and the 1950 statute thus left the Senecas free to make leases *either* in accordance with general federal legislation *or* "for such purposes and such periods as may be permitted by the laws of the State of New York." This position is supported by a letter from the Acting Commissioner of Indian Affairs dated March 14, 1963, not previously brought to our attention. While we find it unnecessary to decide the issue, we think the Senecas' position may well have merit and consequently withdraw any statements in the opinion inconsistent with it. Although such statements tended toward our conclusion that "as may be permitted" meant "as shall not be prohibited" rather than "as may be specifically permitted," they were by no means essential and we would reach the same result if the position now taken by the Senecas is correct.

The petition of the Seneca Nation is granted to the extent indicated and is otherwise denied. The petition of the United States for rehearing is denied.