**STATE OF VERMONT**

v.

**Claude S. BRINEGAR, Secretary of Transportation, United States of America,**
**and**
**Outdoor Advertising Association of America, Inc., Intervenor.**

**Civ. A. No. 6809.**

United States District Court,
D. Vermont.

July 17, 1974.

607

Jonathan N. Brownell, Paterson, Gibson, Noble & Brownell, Montpelier, Vt., for plaintiff.

Peter J. P. Brickfield, Dept. of Justice, Washington, D. C., and William B. Gray, Asst. U. S. Atty., Rutland, Vt., for defendant Brinegar.

Alvin H. Schulman, Botein, Hays, Sklar & Herzberg, New York City, and Henry F. Black, Black & Plante, White River Junction, Vt., for Intervenor.

## OPINION AND ORDER

COFFRIN, District Judge.

### I. *Introduction*

This action, commenced by the State of Vermont on December 12, 1972, challenges the final determination of the Secretary of Transportation (Secretary)

to withhold ten percent of the Federal-aid highway funds apportioned to the State of Vermont for its failure, in the Secretary's view, to make provision for effective control of the erection and maintenance of outdoor advertising signs as required by 23 U.S.C. § 131(b).

## II. *Jurisdiction*

Jurisdiction of this court over the action is conferred by 23 U.S.C. § 131(*l*), which grants the State forty-five days from the date of receipt in which to appeal from an adverse final determination of the Secretary. In this case, the Secretary's final determination was made on November 8, 1972, and received by the State on November 17, 1972. The appeal was commenced within the required statutory period. Under the statute, the filing of an appeal automatically stays the execution of the Secretary's determination until final judgment has been rendered. 23 U.S.C. § 131(*l*).

## III. *Background and History of the Case*

This controversy had its genesis in a letter dated November 1, 1971, from the then Governor of Vermont, Deane C. Davis, to the then Secretary of Transportation, John A. Volpe,[1] requesting that the Secretary exercise his authority under 23 U.S.C. § 131(b) to suspend imposition of any penalty under that section until Vermont completed the removal of nonconforming outdoor advertising under its police power without the payment of compensation. This request was denied by the Secretary on December 31, 1971.

On July 19, 1972, the General Counsel of the Department of Transportation communicated by letter with Vermont's Attorney General, requesting a definitive statement of Vermont's position on whether "effective control" of outdoor advertising as that phrase is used in 23 U.S.C. § 131, required payment of just compensation to affected signowners and further, whether the payment of such compensation was, in Vermont's view, a condition to its receipt of the full share of Federal-aid highway funds allocated to the State.

Vermont's reply, dated July 28, 1972, was brief and to the point. It declared in pertinent part that:

> The State of Vermont can remove outdoor advertising as an exercise of its police powers without paying monetary compensation to the owner of the sign or the owner of the land on which the sign is located; that federal law does not require the State to pay monetary compensation upon the removal of outdoor advertising as a condition of the receipt of federal highway funds.

Shortly before this declaration of its position, Vermont provided the Secretary with a detailed factual review of one case involving the removal of an outdoor advertising sign in the Town of Westminster, Vermont. The State again put forth its position that federal law does not require compensation as a condition for payment of the full allotment of Federal highway funds and, after evidencing its intention to continue to remove highway advertising signs without payment of compensation, requested that the Secretary make a proposed determination whether, because of this position, withholding of 10 percent of Vermont's Federal highway funds was authorized by 23 U.S.C. § 131.

After analyzing all pertinent data, the Secretary's proposed determination dated August 22, 1972, concluded that a state's adoption of a policy not to pay just compensation to the owners of billboards upon their removal constitutes a failure to establish effective control within the meaning of the Highway Beautification Act of 1965, 23 U.S.C. § 131, and such failure warrants imposition of the 10 percent penalty provision in Subsection (b) of Section 131, 23 U.

---

1. Claude S. Brinegar has since succeeded Mr. Volpe as Secretary of Transportation. Pursuant to Rule 25(d)(1), Fed.R.Civ.P., Mr. Brinegar, in his capacity as Secretary of Transportation, is hereby substituted for Mr. Volpe as a named party defendant.

S.C. § 131(b). Consequently, the Secretary proposed to reduce by 10 percent Vermont's apportionment of Federal-aid highway funds beginning with funds for fiscal 1974.

The State, by reply letter dated August 31, 1972, waived its right to a further hearing with consequent delay and stipulated that the Secretary's determination would be based upon the State's July 21, 1972, letter to the Secretary, his reply thereto dated August 22, 1972, and applicable state and federal laws and regulations. Thereafter, in accordance with internal procedures, the Secretary referred the matter to the Federal Highway Administrator who made a recommendation on October 3, 1972, that the Secretary's proposed determination be made final. The final determination of the Secretary was issued on November 8, 1972, and this appeal followed.

On February 21, 1973, the Outdoor Advertising Association of America, Inc. (Association) petitioned to intervene as a party defendant which motion was granted on July 13, 1973. Thereafter, all parties filed motions for judgment on the pleadings or for summary judgment and oral argument on these motions was heard on May 15, 1974.

IV. *Analysis of the Relevant Provisions of the Highway Beautification Act of 1965*

A. *The Statutory Scheme and Pertinent Language of the Act*

The record in this case is not factually complex, and we perceive the issue before us to be predominantly a legal one involving the proper interpretation of the Highway Beautification Act of 1965, 23 U.S.C. § 131. The pertinent provisions of that Act may be summarized as follows.

The general purpose of the Act as expressed in Section 131, 23 U.S.C. § 131, is to establish a control system for outdoor advertising on the interstate and primary highway system.

The control of outdoor advertising will, in the view of Congress, achieve three goals:

(a) The protection of the public investment in the interstate and primary highway system;

(b) The promotion of the safety and recreational value of public travel and

(c) The preservation of natural beauty. 23 U.S.C. § 131(a).

Pursuant to Subsection (b) of Section 131, the states are given the primary task of providing for effective control over outdoor advertising. If a state does not make provision for effective control of outdoor advertising, a 10 percent reduction in the Federal-aid funds for the state's highways is imposed until such time as the state shall make such provision. In addition, the Congressional scheme evidences concern with the economic impact upon persons affected by the removal of such signs. Therefore, enacted after considerable debate, Subsection (g) of Section 131 provides that "just compensation" shall be paid upon the removal of certain classes of outdoor advertising signs, displays and devices. The federal share of such compensation is 75 percent of the total cost of removal. 23 U.S.C. § 131(g).

The proper construction of Section 131 is the task before us. The Secretary and the Association contend that Vermont's failure to make provision for just compensation of those affected by the Act subjects the State to the 10 percent diminution in Federal highway aid provided by Subsection (b) of Section 131. The State disagrees on a two-fold basis. First, it says that effective control must be construed independently of the just compensation provisions of Subsection (g) of the Act. Alternatively, it argues that if the Secretary construed the Act properly, the Act contravenes the Tenth Amendment to the United States Constitution in that it coercively invades a realm reserved to the states under the Constitution's federal-state balance.

Since the State's constitutional argument depends upon the propriety of the Secretary's ruling, we first proceed to a consideration of the manner in which Section 131 should be construed.

In construing the Act, Vermont suggests that the entire meaning of "effective control" is contained in Subsection (c) of Section 131 and since Subsection (c) makes no reference to the payment of just compensation, the failure to provide a signowner with just compensation upon removal of the sign cannot trigger the imposition of the 10 percent penalty since there is no textual nexus in the Act between "effective control" and "just compensation."

■ We disagree with Vermont's position that there is no textual connection between "effective control" and "just compensation" as those terms are used in Section 131. In our view, a careful reading of the Act indicates that Subsection (c) of Section 131 does not enumerate the exclusive parameters for defining "effective control." It is significant that Subsection (c) states in pertinent part that "Effective control means that . . . signs, displays and devices [which are covered by the Act] *shall, pursuant to this section,* be limited to [signs of certain classes and descriptions] . . . ." (emphasis supplied). It is of crucial significance that in Subsection (c) of Section 131 Congress used the word "section" in directing the manner in which the signs are to be limited. Had Congress chosen to use the word "subsection" instead of "section," Vermont's argument would have substantially more plausibility. But, in specifically utilizing the word "section," we believe that Congress meant to and did condition the full payment of Federal highway funds, *i. e.* avoidance of the ten percent penalty, on compliance with all of the conditions contained in Section 131, including those in Subsections (c) and (g). Thus, we perceive that effective control, as used in the Act, requires that any limitation of outdoor advertising to those types of signs referred to in

Subsection (c) be accompanied by just compensation to those persons affected by the limitation. The significance of the selection of the word "section" in Subsection (c) is augmented by the careful use of "subsection" elsewhere in Section 131 where the lettered paragraphs of Section 131 are referred to. See Subsections (d), (g), (j), (*l*), and (m) of Section 131. Furthermore, the term "section" is employed elsewhere in the statute wherever the obvious reference is to the entirety of Section 131. See Subsections (d), (e), (h), (j), (*l*). In light of such careful selectivity in the choice of statutory language, we conclude that the provisions of Subsection (g) must be satisfied for a state to exercise "effective control" within the meaning of Subsections (b) and (c) of Section 131.

### B. *Legislative History*

Resort to legislative history is, of course, unnecessary when the statute under consideration is clear and unequivocal on its face. United States v. Oregon, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed. 2d 575 (1961), or when the meaning of the statute is readily apparent from its language. Banco Nacional de Cuba v. Farr, 383 F.2d 166 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968). In this case we believe that it is perhaps possible to construe the words in the statute to give rise to a legitimate doubt as to the meaning intended, Maun v. United States, 347 F.2d 970 (9th Cir. 1965), and thus we turn, as the parties urge us, to a consideration of the legislative history of Section 131. *See also* United States v. Devonian Gas & Oil Co., 424 F.2d 464 (2d Cir. 1970).

The legislative history of the Highway Beautification Act of 1965 supports the construction derived from our reading of the statutory language. Moreover, nothing in the formulative background of the Act infers a different construction than that which we believe accepted principles of statutory construction warrants. The predominant portion of the legislative activity con-

cerning what is now Section 131 focused upon the question whether compensation should be paid to owners of affected signs.[2] That matter is not before us since Subsection (g) of Section 131 unequivocally commands the payment of just compensation. Our inquiry, then, is directed toward the consequences of a failure to pay just compensation. In the debate on the Senate floor over the bill, Senator Jennings Randolph, the Chairman of the Senate Subcommittee on Public Roads and the sponsor of the Administration's version of the Highway Beautification and Scenic Development Act of 1965,[3] was asked by Senator George Murphy of California, "what would happen" if a state could not afford its 25 percent share of just compensation or for any other reason decided not to pay its share of the compensation requirement. Senator Randolph replied that "there would be a penalty of 10 percent withheld from the amounts payable until the State complies."[4]

Elsewhere in the debate, Senator Randolph took the position that the 10 percent penalty contained in Subsection (g) of Section 131 is reasonable in view of the requirements placed on the state "in both its *financial* and regulatory programs as envisioned in the remainder of the legislation"[5] (emphasis added). Such commentary is wholly inconsistent with Vermont's position that it must satisfy no financial obligations as a condition to receiving its full allotment of Federal-aid highway funds.

 The comments of Congressman Cramer, a member of the House Committee on Public Works which favorably reported the Senate's version of the Act out of its Committee, evidence a similar understanding of the nexus between payment of just compensation and the diminution in Federal highway aid

in the event the state fails to comply with the compensation provisions.[6] We are cognizant that the opinions of individual legislators concerning the meaning of legislation should not be considered conclusive or controlling as to legislative purpose, Universal Underwriters Insurance Co. v. Wagner, 367 F.2d 866, 874 n.14 (8th Cir. 1966). Moreover, this rule of construction is especially applicable where, as in this case, the comments referred to above were made during the floor debates in the House and Senate concerning the bill and thus are not entitled to the same respect as carefully prepared committee reports.[7] Banco Nacional de Cuba v. Farr, *supra*, 383 F.2d at 175. However, the case law is to the effect that the views of a sponsor of the statute and a member of the committee who favorably reported it to the Congress are useful aids to interpretation when a doubt arises as to the meaning of a statute. *See* Labor Board v. Fruit Packers, 377 U.S. 58, 66, 84 S. Ct. 1063, 12 L.Ed.2d 129 (1964); United States v. International Union (UAW–CIO), 352 U.S. 567, 585–86, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957).

On balance, we do not consider the remarks recited above to be of controlling significance in our decision but since they are not contrary to any provision of the legislation and since they are harmonious with what we believe is the proper reading of the statutory language, they are entitled to weight as unchallenged contemporaneous remarks of members of Congress active in the passage of the law. Kay v. FCC, 143 U.S. App.D.C. 223, 443 F.2d 638, 645 n.25 (1970).

In 1972, Congress considered and rejected an amendment to Subsection (g) of Section 131 which would have eliminated the mandatory nature of the just

2. *See, e. g.,* H.R.Rep.No.1084, 89th Cong. 1st Sess. (1965), U.S.Code Cong. & Admin.News 1965, p. 3710.

3. Senate Bill 2084, 89th Congress, 1st Session (1965).

4. 111 Cong.Rec. 23874 (1965).

5. 111 Cong.Rec. 23881 (1965).

6. 111 Cong.Rec. 26259 (1965).

7. We note that the relevant committee reports are silent on the question whether a 10 percent penalty may accompany a failure to pay just compensation to the owners of outdoor advertising affected by the Act.

compensation provisions and in its stead would have granted the states authority to determine whether just compensation should be paid under the Act.[8] Speaking in support of this amendment, its proponent, Congressman Mallary of Vermont, suggested that "the present law is ambiguous with regard to whether the ten percent penalty may be imposed for failure to pay compensation . . . . This amendment will clarify this ambiguity."[9] After comments on this amendment from several other Congressmen, the House rejected the amendment, thus supporting the inference that Congress did not believe the Act to be ambiguous and that it intended a 10 percent reduction in Federal highway funds to result from a failure to pay just compensation to those affected by the removal of outdoor advertising.

In sum, the chief significance of the relevant legislative history of the Highway Beautification Act of 1965 and the amendments offered in connection therewith is that, on the narrow issue before us, it is not inimical to the construction we conceive to be compelled by principles of statutory construction.

### C. *The Decision of the Attorney General*

◼ Our attention is also directed to the 1966 opinion of the Attorney General of the United States which concludes that Section 131 requires "each state to afford just compensation as a condition of avoiding the 10 percent reduction of Subsection (b)." 42 Op.Att'y.Gen. 2 (1966). The Attorney General's opinion, emphasizing both legislative history and a reasonable construction of the words "pursuant to this section" contained in Subsection (c) of Section 131, took the view that to satisfy the "effective control" requirement of Subsection (b) necessitated payment of just compensation to those who are affected by sign removals. It is clear that the opinion of the Attorney General, as a pro-

nouncement concerning the proper construction of the statute, is entitled to respectful consideration, which we give it. See Broadrick v. Oklahoma, 413 U.S. 601, 617–618, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Phyle v. Duffy, 334 U.S. 431, 68 S.Ct. 1131, 92 L.Ed. 1494 (1948); McDonald v. United States, 89 F.2d 128 (8th Cir. 1937), cert. denied, 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352 (1937). Furthermore, the continuing existence of the Attorney General's decision without modification at the time when Congress considered and rejected Congressman Mallary's proposed amendment adds further weight to the contention that the Attorney General's decision properly reflects Congress' intent in enacting Section 131. *Cf.* N.L.R.B. v. North Arkansas Electric Co-op., Inc., 446 F.2d 602, 607 (8th Cir. 1971).

### D. *The Decision of the Secretary of Transportation*

◼ We are entitled to give deference to the interpretation given the statute by the Secretary of Transportation and the Federal Highway Administrator since we find no compelling indications that it is wrong. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). In the case before us, the record reflects a careful, conscientious analysis of the issues by the Secretary, the Department of Transportation's legal counsel, and the Federal Highway Administrator who reviewed the Secretary's proposed determination before it became final. The record is clear that these administrative officials considered each argument presented to them by Vermont and undertook their own independent review of the statutory scheme. In light of these considerations, we believe this case presents an appropriate instance for granting due respect to the administrative interpretation of this

---

8. 118 Cong.Rec. 9284–85 (daily ed. Oct. 5, 1972).

9. *Id.* at 9284.

statute by those charged with administering it. See Udall v. Tallman, 380 U. S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

### E. Policy Considerations

■ Finally, we believe policy reasons support the conclusion that a 10 percent reduction in a State's allocation of Federal highway fund aid should accompany its refusal to pay just compensation. The use of the term "shall" in the "just compensation" provision of the Act, 23 U.S.C. § 131(g) is not merely precatory; it mandatorily directs that just compensation be paid when signs are removed. In addition, one of the clearest principles that emerges from the legislative history concerning the Act is that the payment of just compensation must be furnished to those persons economically affected by the outdoor advertising control system. Under the statutory scheme, however, payment of such compensation emanates from the states, assisted by a substantial subsidy from the federal government of 75 percent of the total cost of such recompense. In light of such adequate, even generous, federal legislation, it is exceedingly difficult to conceive that Congress would establish no mechanism to enforce the federal policy of just compensation which was vigorously debated and ultimately incorporated into Section 131 when, as indicated, the actual payments to signowners may only be obtained from the states. The 10 percent reduction in Federal highway aid exacted for failure to make provision for effective control over outdoor advertising is the only measure in the statutory scheme available to the federal government to effect the congressional design in passing Section 131 and in particular Subsection (g).[10] In our view this consideration is quite important since once the Secretary had promulgated applica-

ble regulations, the effectuation of outdoor advertising controls was left entirely to the states. Whether that policy is unduly coercive upon the states will be · discussed infra. For present purposes, suffice it to say that valid, legitimate policy reasons support imposition of a 10 percent penalty for failure to pay signowners just compensation.

### F. The Status of Signowners' Right to Compensation under Vermont Law

■ Vermont argues that under applicable Vermont law, signowners have no compensable rights in outdoor advertising displays and therefore, insofar as Vermont is concerned, it is meaningless to penalize the State for failing to provide for just compensation when, in any event, no compensation is owed to those affected by the removal of outdoor advertising. The basis of Vermont's argument is that since 1921 Vermont, under its police power, has licensed billboards subject to periodic renewals, and no signowner has a right to continue to maintain his signs in the absence of a valid license. The State emphasizes that the case law in Vermont is to the effect that termination of licenses is not compensable and all interests the signowner has in the signs are possessed by virtue of the licenses and not by any substantive right. See Micalite Sign Corp. v. State Highway Dept., 126 Vt. 498, 236 A.2d 680 (1967); Kelbro, Inc. v. Myrick, 113 Vt. 64, 30 A.2d 527 (1943).

The difficulty with this line of reasoning is that, with regard to the signs involved in this proceeding, we believe that State law enacted subsequent to the above cited decisions requires that just compensation be paid. In 1967, Vermont enacted legislation to further regulate and control outdoor advertising. Public Act No. 333, 1967 Adj. Session.

---

10. Our investigation has disclosed no mechanism apart from the 10 percent reduction for insuring that just compensation is paid to signowners and, after reviewing the legislative history of the Act, we conclude that the underlying understanding of the Con-

gress in passing the Act was that the 10 percent penalty · was the sole inducement mechanism for insuring that the provisions of the Highway Beautification Act were complied with.

Section 16 of the Act provided that:

> Compensation shall be paid upon the taking or removal of outdoor advertising under this act only if federal law when in effect requires payment of compensation for the taking or removal of outdoor advertising on state highways as a condition for payment to the state of federal highway funds, and the federal funds are available.

In 1969, this legislation was modified in minor detail to provide that

> Compensation shall be paid upon the taking or removal of outdoor advertising under this chapter only if, and to the extent federal law, when in effect, requires payment of compensation for the taking or removal of outdoor advertising on state highways as a condition for payment to the state of federal highway funds, and the federal funds are available. Pub.L.No.92, § 11, effective April 19, 1969.

This section as presently enacted reads as follows:

> (a) Compensation shall be paid upon the taking or removal of outdoor advertising under this chapter only if, and to the extent federal law, when in effect, requires payment of compensation for the taking or removal of outdoor advertising on state highways as a condition for payment to the state of federal highway funds, and the federal funds are available. The highway board shall adopt rules for the awarding of compensation which shall use the federal regulations for compensation as guidelines and which rules shall be consistent with the federal regulations. 10 V.S.A. § 496(a).

It is clear that pursuant to 23 U.S.C. § 131(g) federal law requires that just compensation be paid upon the removal of certain classes of outdoor advertising signs. Subsection (g) provides that in the case of an owner of a sign, just compensation shall be paid for the taking of all right, title, leasehold and interest in such sign. In the case of an owner of the real property upon which the sign is located, just compensation must be paid

for the taking of the right to erect and maintain such signs. 23 U.S.C. § 131(g). Furthermore, the State's argument that the measure or valuation of this taking may be difficult to assess in view of Vermont precedent as evidenced by Kelbro, Inc. v. Myrick, *supra,* and Micalite Sign Corp. v. State Highway Dept., *supra,* fails to consider the instruction in Section 496(a) of Title 10, V.S.A. that "the [State] highway board shall adopt rules for the awarding of compensation which shall use the federal regulations for compensation as guidelines and which rules shall be consistent with the federal regulations." Pursuant to this statutory direction, the State Highway Department promulgated regulations on December 14, 1971, governing payment of compensation for the removal of outdoor advertising. See State of Vermont Administrative Procedure Compilation Highway Department Regulations, ¶ 11.7, 11.8 and 11.10. Therefore, contrary to Vermont's contention, we believe that there is a body of state law governing the manner and measure of compensating signowners who are subject to the provisions of the Highway Beautification Act of 1965. Rule 3 of the Highway Department's Regulations requires the Department to assess the fair market value of *any* compensable interest relating to the removal of outdoor advertising. There is no occasion for us in this proceeding to enumerate the factors which must be considered in arriving at the fair market value of affected signs, but it is clear that at least with regard to outdoor advertising subject to the Highway Beautification Act of 1965, Vermont does recognize that such signs have some value upon their removal provided federal law requires the payment of compensation.

■ In any event, whatever difficulty may be encountered in measuring the amount of compensation has no logical impact upon the basic mandate of Subsection (g) of Section 131 that compensation be paid. As indicated, we believe it is clear that federal law requires just compensation be paid upon the re-

moval of outdoor advertising signs. Consequently, by virtue of 10 V.S.A. § 496(a), the conclusion follows with equal clarity that Vermont state law requires that compensation be paid to any affected signowners along the interstate and primary highway system. The record before us demonstrates that Vermont has not complied with 23 U.S.C. § 131(g), or 10 V.S.A. § 496(a) in its treatment of billboard removals. The record further reflects that on July 18, 1967, the State granted a license to the Standard Company to erect an outdoor advertising sign on U.S. # 5, a primary highway in Westminster, Vermont. This sign was an outdoor advertising sign on a primary highway within the meaning of 23 U.S.C. § 131(g)(2).[11] On July 19, 1972, the five year period of the license expired and despite the Company's demand for compensation, the state required it to remove the sign without any remuneration. 10 V.S.A. § 496(a) was effective at the time this sign was removed as were the State Highway Department's regulations concerning valuation of such signs. Consistent with our view that federal law requires compensation for the removal of such signs as a condition for payment to the State of Federal highway funds, the State should have applied the principles of 10 V.S.A. § 496(a) and compensated this Company for the removal of its sign.

### G. *Summary*

To summarize our holding on the proper interpretation of the Act, then, "effective control" as used in the Highway Beautification Act of 1965 includes the requirement that just compensation be paid to those persons affected by the removal of outdoor advertising signs, and a failure or refusal to pay just com-

pensation subjects a state to a 10 percent reduction in its Federal-aid highway fund allocation. Consequently, we agree with the construction of the Act adopted by the Secretary.

### V. *The Constitutionality of the Highway Beautification Act of 1965*

Vermont ardently urges that in the event we conclude that the Secretary properly construed Section 131, the Act is unconstitutional in that it contravenes the Tenth Amendment to the United States Constitution.[12] However, Vermont relies upon no case holding that a federal aid program which conditions payments to the states on the fulfillment of certain federally established conditions is unconstitutional. The state's approach emphasizes the concern of Congress with the end result of the legislation in controlling outdoor advertising whereas the defendant's position is that Congress was concerned not only with the manner in which outdoor advertising was to be controlled but also with the method used to obtain that control, *i. e.* the manner of compensating owners whose signs were removed pursuant to the Act.

In construing the Tenth Amendment, the Supreme Court indicated in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1940) that:

> The amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek

11. Section 131(g)(2) provides in substance that just compensation shall be paid upon the removal of an outdoor advertising sign "lawfully on any highway made part of the interstate or primary system on or after the date of enactment of this subsection and before January 1, 1968." The "date of enactment of this subsection" referred to in Subsection (g) is the date of enactment of

Pub.L.No.89–285, which was approved on October 22, 1965.

12. The Tenth Amendment provides that:
The powers not delegated to the United States by the Constitution, nor prohibited by it to the States are reserved to the States respectively, or to the people.

to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers. *Id.* at 124, 61 S.Ct. at 462 (citations omitted).

The standard adopted in *Darby* for measuring the constitutionality of federal legislation in light of the Tenth Amendment is that the federal government has the authority "to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." United States v. Darby, 312 U.S. at 124, 61 S. Ct. at 462. The rule promulgated in *Darby* was adhered to in Oklahoma v. United States Civil Service Comm., 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947). In that case, the United States Civil Service Commission withheld a certain share of the State's Federal highway funds because of the State's violation of the terms of the Hatch Political Activity Act, a federal enactment. The State had received loans and grants from a federal agency that were conditioned in part on compliance with the Hatch Act. In holding this conditioning of federal funds constitutional in the face of a challenge under the Tenth Amendment, the Court posited that:

> While the United States is not concerned and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states shall be disbursed.
>
> The Tenth Amendment does not forbid the exercise of this power in the way that Congress has proceeded in this case. 330 U.S. at 143, 67 S.Ct. at 553.

Vermont recognizes the doctrine announced by these cases but, relying on language in Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L. Ed. 1279 (1937), contends that the case before us transcends the permissible parameters of that doctrine. In Vermont's language, "the outermost line" has been passed by the federal government in enacting Section 131 of the Highway Beautification Act.

Under scrutiny in *Steward Machine* was the Federal Unemployment Tax on employers which contained a provision allowing up to a 90 percent credit for contributions to an unemployment fund established by state law in conformity with federal standards. In holding the law constitutional under the Tenth Amendment, the Court reasoned that the combination of the tax and credit did not have the effect of coercing, destroying or impairing the autonomy of the states.

■ Thus, it appears that the court has postulated a two-tiered test for measuring the constitutionality of federal legislation under the Tenth Amendment:

1. Is the measure under attack reasonably related to a legitimately national end and, if so,

2. Does the challenged enactment coerce the state into participating in the federal scheme or does it merely induce the state to act?

■ Vermont would have us limit the federal goals in the control of outdoor advertising to the specific purposes referred to in Subsection (g) of Section 131 of the Act and conclude therefrom that no rational nexus exists between requiring compensation to signowners and those purposes. However, the fundamental congressional aim as expressed in Subsection (a) of Section 131 is that the erection and maintenance of outdoor advertising should be controlled, and Subsection (g) of the Act indicates quite clearly that such control is to be carried out in part by paying just compensation to those who are adversely affected by the removal of outdoor advertising. As previously indicated, just compensation for signowners affected by the Act was a foremost congressional consideration as both the mandatory language of Subsection (g) of Section 131 and the legislative history reveal. We believe that the compensation of signowners is an integral aspect of the statutory scheme and is a policy that is "legitimately national." *Steward Machine, supra* at 591, 57 S.Ct. 883. Thus,

the measure was within Congress' power to enact and the first requirement for constitutionality under the Tenth Amendment has, in our view, been satisfied.

With regard to any possible coercion of the state, the penalty which a non-complying state suffers is 10 percent of its Federal-aid highway funds. Although in absolute terms, this 10 percent reduction may constitute a considerable sum of money under certain circumstances, when considered in relation to a state's entire allocation of Federal highway aid, we cannot say that it irresistibly compels a state under threat of economic catastrophe to embrace the federal plan. Furthermore, any potential duress in paying just compensation as a component of effective control under penalty of a 10 percent fund cut is ameliorated by the 75 percent federal contribution to the cost of justly compensating signowners provided for in Subsection (g) of Section 131. Clearly the 10 percent penalty is an inducement for the states to satisfy the requirements of the Highway Beautification Act of 1965, but we do not believe that the rights of a state reserved to it by the Tenth Amendment have been impermissibly invaded by this inducement. The dicta in Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1922) is appropriate in this regard:

> If Congress enacted [the statute] with the ulterior purpose of tempting [the states] to yield, that purpose may be effectively frustrated by the simple expedient of not yielding. *Id.* at 482, 43 S.Ct. at 599.

Therefore, we hold that the Highway Beautification Act of 1965 as we interpret it is not unconstitutional under the Tenth Amendment.

VI. *Conclusion*

Vermont has emphasized throughout this litigation that it is a national leader in effectuating the ultimate aim of the Highway Beautification Act of 1965 which is to remove billboards from interstate and primary highways. The Secretary raises no serious objection to this assertion. However, the ultimate result to be achieved was not the sole congressional concern in passing the Act. Regardless of how effective Vermont may have been in removing outdoor advertising, it did not satisfy the federal mandate of justly compensating signowners for such removal, and our conclusion is that under the Act such dereliction justifies a 10 percent reduction in Federal-aid highway funds. Furthermore, as indicated above, such a conditioning of federal funds upon the accomplishment of certain requirements does not run afoul of the Constitution. We therefore affirm the decision of the Secretary and render judgment for the defendants.