**MONTGOMERY COUNTY, MARYLAND, Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Defendant,**

and

**American Association for Comprehensive Health Planning, Inc., Intervenor.**

**Civ. No. K–77–166.**

United States District Court,
D. Maryland.

March 30, 1978.

Richard S. McKernon, County Atty., Richard E. Frederick, Deputy County Atty., and Nathan J. Greenbaum, Asst. County Atty. for Montgomery County, Maryland, Rockville, Md., for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., and David J. Anderson and Steven I. Frank, Attys., Dept. of Justice, Washington, D. C., for defendant.

Steven B. Epstein and William G. Kopit, Washington, D. C. and Russell H. Gardner, Baltimore, Md., for intervenor.

FRANK A. KAUFMAN, District Judge.

Montgomery County, Maryland, contends that the National Health Planning and Resources Development Act of 1974 unconstitutionally offends both the Guaranty Clause of and the Tenth Amendment to the United States Constitution. In addition, the County asserts that certain regulations promulgated by the Secretary of Health, Education and Welfare (HEW) under that Act offend the Tenth Amendment and also are beyond the authority of the 1974 statute. Defendant has moved alternatively to dismiss and for summary judgment. Plaintiff has also moved for summary judgment. The American Association for Comprehensive Health Planning, Inc. has been permitted to intervene as a defendant. Jurisdiction exists under 28 U.S.C. § 1331.

## I. FACTS

The facts are undisputed. In 1974, the Congress amended the Public Health Service Act (42 U.S.C. § 201 *et seq.*) by passing the National Health Planning and Resources Development Act of 1974, Pub.L. No.93–641, 88 Stat. 2225 (42 U.S.C. § 300k, *et seq.*) ("Act"). Section 2 of that Act (42 U.S.C. § 300k) states that its "purpose" is "to facilitate the development of recommendations for a national health planning policy, to augment areawide and State planning for health services, manpower, and facilities, and to authorize financial assistance for the development of resources to further that policy." In enacting the Act the Congress cited the inflationary effects upon the cost of health care and the maldistribution of health care facilities. *See* S.Rep.No.93–1285, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin. News, pp. 7842, 7878–79, 7892–96. Plaintiff apparently attacks only sections of Title XV which the 1974 Act added to the Public Health Service Act. That Title (42 U.S.C. § 300k–1 *et seq.*) establishes federal support, through HEW grants, for a nationwide system of health planning and development organizations comprising essentially three tiers: (1) Health Systems Agencies, responsible for the development and implementation of health planning at the local level; (2) State Health Planning and Development Agencies, responsible in general for conducting the health planning activities of the states; and (3) Statewide Health Coordinating Councils, responsible for preparing

final state health plans and for advising the state health planning and development agencies in the performance of their functions.

Section 1501 of the Act (42 U.S.C. § 300k–1) delegates to the Secretary of HEW the authority to develop regulations on national health policy, including standards respecting supply, distribution and organization of health resources and development of a statement of national health planning goals.

Section 1511 of the Act (42 U.S.C. § 300*l*) requires the Governor of each state to establish Health Service Areas and their respective boundaries in accordance with geographic, demographic, and other criteria set forth in section 1511 and to submit the same to the Secretary of HEW. The Secretary has final authority to determine whether such areas comply with section 1511 standards. The Secretary himself, if he finds any area inappropriate or if the Governor does not designate an area, may define an area. The Secretary is also required to review on a continuing basis the appropriateness of the areas. Before the Secretary may act on his own to revise any area boundaries, he must first consult with the Governor of the state involved and with certain state and local authorities. The designations of 202 health service areas for substantially the entire country was made through publication of a Notice in the Federal Register of September 2, 1975 (40 Fed. Reg. 40306).

Sections 1515 and 1516 of the Act, 42 U.S.C. § 300*l*–4, 5, direct the Secretary to enter into an agreement with an eligible entity to act as the Health Systems Agency (HSA) for a given area and to make a grant to such entity for the performance of its functions as an HSA. The Secretary may not enter into such an agreement unless and until an entity has submitted an application to him for designation as an HSA and the Governor of the state in question has been consulted about the designation of the entity. Section 1515(c)(2) (42 U.S.C. § 300*l*–4(c)(2)).

Requirements as to the organization and operation of the HSAs are set forth in section 1512 (42 U.S.C. § 300*l*–1). Section 1512(b)(1) provides that an HSA may be (a) a nonprofit, private corporation not controlled by any other legal entity and engaged only in health planning and development functions; or (b) a public regional planning body composed of a majority of elected officials of its constituent units of government or authorized by state law to perform health planning functions, and having a planning area identical to the Health Service Area; or (c) a single unit of general local government which has a jurisdiction identical to the Health Service Area.

The HSAs are supported primarily through federal health planning grants pursuant to section 1516 (42 U.S.C. § 300*l*–5). HSAs for about half of the health service areas in the nation have been conditionally designated and awarded planning grants by the Secretary. Under section 1512(b)(3), and HSA, which is a public regional planning body or a unit of general government, is to have a governing body for health planning. The membership of the governing body must be drawn from various categories of health care consumers and providers. Section 1512(b)(3)(C) (42 U.S.C. § 300*l*–1(b)(3)(C)). The governing body is responsible for the internal affairs of the HSA and has "exclusive authority" to perform for the agency the functions delegated to the HSA by the Act.

The functions of the HSAs are described in section 1513 (42 U.S.C. § 300*l*–2) and include:

(1) assembly and analysis of health-related data leading to the formulation of both long-term Health Systems Plans (HSPs) and short-term Annual Implementation Plans (AIPs). The latter are required to state local goals and priorities in health planning. In devising its plans, each HSA must take "appropriate consideration of the recommended national guidelines for health planning policy issued by the Secretary." Section 1513(b)(2);

(2) implementation of the HSPs and AIPs including the provision of technical assistance and grants emanating from the Area Health Services Development Fund to various individuals and public and private entities. Section 1513(c);

(3) coordination of activities with other local health service agencies. "The agency shall . . . enter into agreements with them which will assure that actions taken by such entities which alter the area's health system will be taken in a manner which is consistent with the HSP and the AIP in effect for the area . . .." Section 1513(d);

(4) review and approval of proposed use of federal funds

(i) appropriated under this Act, the Community Mental Health Centers Act, or the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970 for grants, contracts, loans, or loan guarantees for the development, expansion, or support of health resources; or

(ii) made available by the State in which the health service area is located (from an allotment to the State under an Act referred to in clause (i)) for grants or contracts for the development, expansion, or support of health resources. Section 1513(e). The Secretary may fund projects disapproved by an HSA only after extensive review of the HSA's decision and only if he submits to the HSA a detailed statement of the reasons for his decision. *Id.*;

(5) assistance to State Health Planning and Development Agencies with re-

gard to the need for new institutional health services. Section 1513(f). Section 1513(f) requires each HSA to assist the state agencies in reviewing and making recommendations on applications for certificates of need. Those certificates, pursuant to section 1523(a)(4)(A) (42 U.S.C. § 300m–2(a)(4)(A)), are conditions precedent to federal funding and support;

(6) review on a continuing basis of existing and proposed local institutional health services with recommendations as to the appropriateness of such services to the State Health Planning and Development Agency. Section 1513(f), (g);

(7) recommendation of projects to each State Health Planning and Development Agency for modernization and construction of medical services to achieve the goals of the HSPs and AIPs. Section 1513(h).

State Health Planning and Development Agencies are established as statewide counterparts to the HSAs. Sections 1521–26 (42 U.S.C. § 300m *et seq.*). The Governor of each state selects the state agency to apply to the Secretary for designation as the State Health Planning and Development Agency ("State Agency"). If he agrees, the Secretary may make either a conditional or final designation of an agency as the State Agency.[1] The Secretary is not authorized to enter into a designation agreement with the Governor of a state unless (1) the state has submitted a State Administrative Program in accordance with the requirements of section 1522 of the Act, (2) there are adequate assurances that the State Agency will have the authority and resources to administer the State Administrative Pro-

---

1. However, section 1521(d) of the Act (42 U.S.C. § 300m(d)) provides:

If, upon the expiration of the fourth fiscal year which begins after the calendar year in which the National Health Policy, Planning, and Resources Development Act of 1974 is enacted, an agreement under this section for the designation of a State Agency for a State is not in effect, the Secretary may not make any allotment, grant, loan, or loan guarantee, or enter into any contract, under this Act, the Community Mental Health Centers Act, or the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970 for the development, expansion, or support of health resources in such State until such time as such an agreement is in effect.

gram and conduct the state planning activities required by section 1523, and (3) there has been established a Statewide Health Coordinating Council ("SHCC") pursuant to section 1524 of the Act. The Governor appoints members of his state's SHCC. However, at least sixty percent of the SHCC members must be appointed from lists of nominees submitted to the Governor by the HSAs in the state. Section 1524(b) (42 U.S.C. § 300m–3(b)). The State Agency has the responsibility to administer the state certificate of need program and prepare a preliminary State Health Plan. The SHCC has the responsibility to coordinate the AIPs and the HSPs of the HSAs, to revise and approve or disapprove the State Health Plans submitted by the State Agency, to review applications for planning grants, to advise the State Agency as to the performance of its function, and to review and make recommendations with regard to each application for federal funds under this Act and certain other federal acts. Final approval of the state plan and applications for federal funds lies with the Secretary. However, if an SHCC disapproves an application for federal funds, the Secretary may not make such funds available until, upon a request by the Governor of the particular state for which funds are sought, the Secretary has made a review of the SHCC decision. If the Secretary then decides to override the SHCC and to make such funds available, he must submit to the SHCC a detailed statement of the reasons for his decision. Section 1524(c)(6) (42 U.S.C. § 300m–3(c)(6)).

Montgomery County has been designated a health service area in Maryland. Therefore, the County is eligible to have designated as an HSA a single unit of general local government which has a jurisdiction identical to the health service area. Section 1512(b)(1)(C). The Montgomery County Council has enacted legislation designed to conform with the Act.[2] The County has submitted to the defendant an application for designation and funding of the County government as an HSA. However, the Secretary concluded that the County legislation was defective because it provided for the right of approval or disapproval by the

---

**2.** The County Council amended the Health and Sanitation title of the Montgomery County Code to implement its designation as an HSA. *See* Montgomery County Council Bill No. 4–76, exhibit C to the complaint in this case. That amendatory legislation, in several provisions, gave the County government final approval authority over the AIPs and HSPs developed by its special governing body.

In particular, section 24–32(g) provided:

24–32. Health Services Planning Board [the special governing body]; responsibilities and authority.

The Board shall:

*   *   *   *   *   *

(g) Have the exclusive authority to perform for the Agency [the County government] the health planning and resources development functions as set forth in Section 1513 of the Act and in particular:

*   *   *   *   *   *

(2) *in accordance with Agency approval* establish, annually review, coordinate as appropriate with other health systems agencies in the Metropolitan region, and amend as necessary a Health Systems Plan for Montgomery County as described in Section 24–38 of this article;

(3) *in accordance with Agency approval* establish, annually review, and amend as necessary an Annual Implementation Plan as described in Section 24–39 of this article; *   *   *. [Emphases added.]

Section 24–34(e) provided, in part:

24–34. Health Systems Agency; County Council and County Executive.

The County Executive and the County Council shall exercise the following authority over the Board's health planning and resources development program:

*   *   *   *   *   *

(e) the County Council shall review and approve or disapprove the following after receipt of and action on the recommendations of the County Executive:

(1) Health Systems Plan;

(2) Annual Implementation Plan; *   *.

Section 24–38(e), concerning development of Health Systems Plans (HSPs), provided:

24–38. Health Systems Plan; preparation; contents; public notice.

*   *   *   *   *   *

(e) Following public hearing and worksession on the proposed plan, or amendment, the Board [the special governing body] shall, before final action, submit its proposed plan to the County Executive and County Council for review and action.

Section 24–39(d) contained an identical provision concerning Annual Implementation Plans (AIPs).

County over the HSP and the AIP contrary, according to the Secretary, to HEW regulations promulgated by the Secretary which only allow a single unit of general local government (Montgomery County, in this case) the opportunity to comment on a HSP or AIP. 42 C.F.R. § 122.109(d)(iv).[3] In accordance with his said conclusion, the Secretary wrote to Montgomery County Executive James P. Gleason and advised the latter that the County legislation was unacceptable and suggested that unless acceptable County legislation was enacted, federal funding would be jeopardized. In response, the Montgomery County Council drafted corrective legislation which eliminated the right of approval or disapproval by the County. That legislation was enacted over the veto of Mr. Gleason.[4]

Subsequently, HEW forwarded to Mr. Gleason, a conditional HSA designation agreement. The County executed and returned the agreement to HEW. Despite its acquiescence in the agreement, the County maintains that the agreement is comprised of mandated guidelines which do not provide for the appropriate participation by the County in health systems planning.

## II. HEW REGULATIONS

█ Interpretative regulations contemporaneously promulgated by the officer or agency charged with administration of a statute must be sustained unless the regulations are unreasonable or plainly inconsistent with the statute. *Bingler v. Johnson,* 394 U.S. 741, 750–51, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Florida v. Mathews,* 526 F.2d 319, 323 n.10 (5th Cir. 1976); *Gordon v. Forsyth,* 409 F.Supp. 708, 723 (M.D.N.C.1975). The Fourth Circuit has recently discussed the standard of review to be accorded an agency's implementation of a statute:

In reviewing an implementation plan under the Clean Air Act, the reviewing court must apply substantially the same standards imposed by the Administrative Procedure Act. See *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970). The authority to make such regulations must be found in the statute, the procedures followed must be lawful, and the plan must be constitutional. If these requirements are met, the challenged regulations may be set aside only where they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." * * *

*Maryland v. EPA,* 530 F.2d 215, 219 (4th Cir. 1975), *vacated on other grounds sub nom. EPA v. Brown,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).

### A.

Plaintiff contends that there is no statutory basis to sustain 42 C.F.R. § 122.-

---

**3.** That regulation is set out in full at pp. 1237 1238, *infra.*

**4.** *See* Montgomery County Council Bill No. 37–76, exhibit G to the complaint in this case. That bill amended the provisions cited in note 2, *supra,* to remove from the County government final approval authority over the HSAs and AIPs. Instead, the County government was to have an opportunity to review and comment upon the plans developed by the special governing body. Bill No. 37–76 also added new provisions, § 24–32(j), (k), which spelled out the process of review and comment:

24–32. Health Services Planning Board [the special governing body]; responsibilities and authority.
The Board shall:
* * * * * *
(j) Provide the County Council and County Executive an opportunity to review and comment on the Health Systems and Annual Implementation Plans prior to their adoption by the Board. The County Executive shall provide his comments and recommendations to the County Council within 15 days after receipt of the Plan(s). The County Council shall provide its comments and recommendations to the Board within 15 days after receipt of the County Executive's comments and recommendations. The County Executive and County Council shall be provided a response in writing by the Board as to their action on each specific comment or recommendation with respect to the Health Systems and Annual Implementation Plans.
(k) Provide the County Executive and County Council, at their request, an opportunity to review or comment on any action of the Board forwarded to other authorities.

109(b)(3)(i).[5] That regulation limits to one-third the representation of public elected officials and other area governmental officials on the governing body of an HSA. Montgomery County challenges that limitation. In *Missouri v. Mathews,* Civil No. 76–1065 (D.D.C. April 28, 1977), Judge Aubrey E. Robinson, Jr. of the District Court for the District of Columbia held that that regulation was "impermissibly contrary to the legislative intent." Slip op. at p. 3. The Secretary did not appeal from Judge Robinson's opinion. Instead, HEW, by amendment to that regulation, deleted the one-third limitation. *See* 43 Fed.Reg. 1253 (Jan. 6, 1978).[6] Thus, the within challenge by plaintiff to the regulation has become moot.

### B.

Plaintiff asserts that by promulgating 42 C.F.R. § 122.109(d) the Secretary has exceeded his statutory authority because he has interpreted section 1512(b)(3) of the Act to give final approval authority over the

5. At the time this suit was filed that regulation read, in relevant part:

(b) *Composition.* The membership of the governing body of an agency shall meet the following requirements:

\*     \*     \*     \*     \*     \*

(3) The total membership as described in paragraphs (b)(1) and (2) of this section shall:

(i) Include (either through consumer or provider members) a number of public elected officials and other representatives of governmental authorities in the agency's health service area and representatives of public agencies in the area concerned with health which is not more than ⅓ of the total membership;

\*     \*     \*     \*     \*     \*

6. The regulation, as amended, presently provides, in relevant part, as follows:

(b) *Composition.* The membership of the governing body of an agency shall meet the following requirements:

\*     \*     \*     \*     \*     \*

(3) The total membership as described in paragraphs (b)(1) and (2) of this section shall:

(i) Include (either through consumer or provider members) public elected officials and other representatives of governmental authorities in the agency's health service

AIPs and HSPs to the governing body of the HSA. The Secretary's position has manifested itself not only in that challenged regulation but in his refusal to designate Montgomery County as an HSA until that County amended its local legislation to remove final approval authority from local elected officials.[7]

Section 1512(b)(3) of the Act reads, in relevant part:

(3) *Governing Body.—*

(A) *In general.—*A health systems agency which is a public regional planning body or unit of general local government shall, in addition to any other governing body, *have a governing body for health planning,* which is established in accordance with subparagraph (C), which shall have the responsibilities prescribed by subparagraph (B), and *which has exclusive authority to perform for the agency the functions described in section 1513.* \*  \*  \* [Emphases added.]

Section 1513 is discussed in some detail *supra* at pp. 1232–1233.[8]

area and representatives of public agencies in the area concerned with health;

\*     \*     \*     \*     \*     \*

7. *See* nn. 2, 4, *supra.*

8. Sections 1512(b)(3)(B) and (C) read as follows:

(3) *Governing Body.—*

\*     \*     \*     \*     \*     \*

(B) *Responsibilities.—*The governing body—

(i) shall be responsible for the internal affairs of the health systems agency, including matters relating to the staff of the agency, the agency's budget, and procedures and criteria (developed and published pursuant to section 1532) applicable to its functions under subsections (e), (f), and (g) of section 1513;

(ii) shall be responsible for the establishment of the health systems plan and annual implementation plan required by section 1513(b);

(iii) shall be responsible for the approval of grants and contracts made and entered into under section 1513(c)(3);

(iv) shall be responsible for the approval of all actions taken pursuant to subsections (e), (f), (g), and (h), of section 1513;

(v) shall (I) issue an annual report concerning the activities of the agency, (II) include in that report the health systems plan and annual implementation plan developed

The Secretary has promulgated the following regulation:

(d) *Responsibilities and authority.* (1) The governing body of a health systems agency shall:

(i) Be responsible for the internal affairs of the agency, including matters relating to the staff of the agency and the agency's budget;

(ii) Be responsible for the adoption of procedures and criteria developed and published pursuant to section 1532 of the Act and applicable regulations of the Secretary to be utilized in the agency's performance of its functions under section 1513(e), (f) and (g) of the Act;

(iii) Be responsible for issuing an annual report concerning the activities of the agency in accordance with § 122.115 of this subpart; and

(iv) Have the exclusive authority to perform for the agency the functions described in section 1513 of the Act and the agency's designation agreement entered into pursuant to § 122.106 or 122.107 of this subpart. For such purposes the term

by the agency, and a listing of the agency's income, expenditures, assets, and liabilities, and (III) make the report readily available to the residents of the health service area and the various communications media serving such area;

(vi) shall reimburse its members for their reasonable costs incurred in attending meetings of the governing body;

(vii) shall meet at least once in each calendar quarter of a year and shall meet at least two additional times in a year unless its executive committee meets at least twice in that year; and

(viii) shall (I) conduct its business meetings in public, (II) give adequate notice to the public of such meetings, and (III) make its records and data available, upon request, to the public.

The governing body (and executive committee (if any)) of a health systems agency shall act only by vote of a majority of its members present and voting at a meeting called upon adequate notice to all of its members and at which a quorum is in attendance. A quorum for a governing body and executive committee shall be not less than one-half of its members.

*(C) Composition.*—The membership of the governing body and the executive committee (if any) of an agency shall meet the following requirements:

(i) A majority (but not more than 60 per centum of the members) shall be residents of the health service area served by the entity who are consumers of health care and who are not (nor within the twelve months preceding appointment been) providers of health care and who are broadly representative of the social, economic, linguistic and racial populations, geographic areas of the health service area, and major purchasers of health care.

(ii) The remainder of the members shall be residents of the health service area served by the agency who are providers of health care and who represent (I) physicians (particularly practicing physicians), dentists, nurses, and other health professionals, (II) health care institutions (particularly hospitals, long-term care facilities, and health maintenance organizations), (III) health care insurers, (IV) health professional schools, and (V) the allied health professions. Not less than one-third of the providers of health care who are members of the governing body or executive committee of a health systems agency shall be direct providers of health care (as described in section 1531(3)).

(iii) The membership shall—

(I) include (either through consumers or provider members) public elected officials and other representatives of governmental authorities in the agency's health service area and representatives of public and private agencies in the area concerned with health,

(II) include a percentage of individuals who reside in nonmetropolitan areas within the health service area which percentage is equal to the percentage of residents of the area who reside in nonmetropolitan areas, and

(III) if the health systems agency serves an area in which there is located one or more hospitals or other health care facilities of the Veterans' Administration, include, as an ex officio member, an individual whom the Chief Medical Director of the Veterans' Administration shall have designated for such purpose, and if the agency serves an area in which there is located one or more qualified health maintenance organizations (within the meaning of section 1310), include at least one member who is representative of such organizations.

(iv) If, in the exercise of its functions, a governing body or executive committee appoints a subcommittee of its members or an advisory group, it shall, to the extent practicable, make its appointments to any such subcommittee or group in such a manner as to provide the representation on such subcommittee or group described in this subparagraph.

"exclusive" as it applies to the role of the governing body means that the governing body shall have the sole, undivided authority to act for the agency in performing such functions subject to the provision of paragraph (f)(1) of this section relating to the delegation of functions to an executive committee; *Provided,* That this does not preclude the public regional planning body or single unit of general local government from establishing procedures not inconsistent with the requirements of this part for the functioning of the agency, including an opportunity to comment on any action proposed by the governing body in the performance of its functions; and *Provided further,* That the public regional planning body or single unit of general local government must be given the opportunity to comment on the health systems plan and the annual implementation plan prior to their establishment.

(2) The public regional planning body or single unit of general local government may establish rules and regulations for the exercise of the responsibilities described in paragraph (d)(1) of this section by the governing body; *Provided,* That such rules and regulations are not inconsistent with the Act and the regulations of this part.

42 C.F.R. § 122.109(d).

The Secretary asserts in effect that the "governing body" created by section 1512(b)(3)(A), and not the HSA itself, when the latter is "a public regional planning body or unit of general local government," as is the case herein, has the last word. Thus, the Secretary contends that such an HSA is precluded by section 1512(b)(3)(A) from exercising substantive control over its own functions, including approval or disapproval of its AIPs and HSPs. Section 1512(b)(3)(A) does not, however, so provide. That section does state specifically that the governing body shall have "exclusive authority to perform *for the agency*" various delineated functions (emphasis added). However, those words in no way indicate that the HSA is to be subordinate to the governing body in carrying out the func-

tions delegated to the HSA by the Act. However, even if those words could be stretched to mean what the Secretary urges, the legislative history teaches otherwise.

In the House version of the bill, H.R. 16204, public agencies were only required to have an advisory health council, with final decisions being made by the public governing body, *i. e.,* herein, Montgomery County. The Senate version, S. 2994, accorded greater authority to the special governing body. The bill which was ultimately enacted conforms largely to the Senate version. However, as the following colloquies illustrate, it was understood that certain aspects of the House bill survived in the conference version:

Mr. KAZEN. What is the effect of the Senate amendments?

Mr. ROGERS. The Senate amendments were basically as to this: They had a different council than we had, so we have combined the two into one council. That was one.

They had an independent council under the governing body, which we have resolved to the satisfaction of the gentleman from California (Mr. Moss), and this will be made clear in the colloquy with the gentleman from Hawaii [Mr. Matsunaga]. It is in concurrence with the position of the gentleman from California (Mr. Moss).

Basically, those were about the main things that were done. Most of the House provisions were kept. There were some trivial or small things, but it is the basic House bill.

Shortly thereafter, on the same day in the same debate, the following was stated:

Mr. MATSUNAGA. Mr. Speaker, in behalf of the gentleman from California (Mr. Moss) and myself, I would like to ask a series of questions which I will direct to the distinguished Chairman of the Subcommittee, the gentleman from Florida (Mr. Rogers).

Under section 1512(b)(3) of the report, a health systems agency, which is a public

regional planning body, or unit of general local government, shall in addition to its governing body have a separate governing body for health planning. Am I correct in my understanding that the governing body for health planning of such a public body or unit of local government would be appointed and be subject to removal by the governing body of the Health Systems Agency?

Mr. ROGERS. That would be correct, that is exactly as the situation would exist.

Mr. MATSUNAGA. Further, Mr. Speaker, I would ask the gentleman, am I correct in my understanding that the governing body for health planning would be subject to the laws and regulations of the public body, or unit of Government acting as the Health Systems Agency?

Mr. ROGERS. Yes, that would be correct.

Mr. MATSUNAGA. If the gentleman will yield further?

Mr. ROGERS. Certainly.

Mr. MATSUNAGA. Mr. Speaker, I would ask the gentleman am I correct in my understanding that in carrying out the responsibilities prescribed in subparagraph (b)(3)(B) of section 1512, the governing body for health planning would be subject to the result and rulings of the public body or unit of government acting as the Health Systems Agency and that the health system plans developed pursuant to section 1513 and the annual implementation plan would be submitted to the Health Systems Agency for approval?

Mr. ROGERS. That is correct.

And, again, subsequently on the same day in the same debate:

Mr. GOLDWATER. Mr. Speaker, perhaps the gentleman from Hawaii (Mr. Matsunaga) has clarified the points, but I want to be absolutely sure, because the State of California had great reservations over the so-called dictatorial imposition of new regional organizations preempting the organizations they already have.

It is my understanding that in the conference report and, I presume, the Moss amendment, that these reservations were taken care of?

Mr. ROGERS. These are taken care of. This colloquy simply confirms that as carrying out the wishes of the gentleman from California (Mr. Moss).

120 Cong.Rec. 41853–54 (1974).

The pertinent Senate colloquy reads:

Mr. JAVITS. Mr. President, to clarify one or two technical matters in the bill, I would like to address a question to the chairman, the Senator from Massachusetts (Mr. Kennedy). Under section 1512(b)(3) of the report, a Health Systems Agency, which is a public regional planning body or unit of general local government, shall in addition to its governing body, have a separate governing body for health planning. It is my understanding that the governing body for health planning of such a public body or unit of local government would be appointed and subject to removal by the governing body of the Health Systems Agency?

Mr. KENNEDY. That is correct.

Mr. JAVITS. It is my understanding that the governing body for health planning would be subject to the laws and regulations of the Health Systems Agency.

Mr. KENNEDY. That is also correct.

Mr. JAVITS. Furthermore, am I correct in my understanding that in carrying out the responsibilities prescribed in subparagraph (3)(B) of section 1512, the governing body for health planning would be subject to the rules and rulings of the Health Systems Agency and that the health systems plans developed pursuant to section 1513 and annual implementation plan would be submitted to the Health Systems Agency for approval?

Mr. KENNEDY. That is correct.

120 Cong.Rec. 41174–75 (1974).

Congressman Rogers and Senator Kennedy were the floor managers of the conference bill in the House and Senate, respectively. Their comments indicate that each governmental unit HSA is to have the right of approval over AIPs and HSPs developed

by the governing bodies. Moreover, their comments show that an HSA which is a public regional planning body, or a unit of general local government such as Montgomery County, has the last word, and not the "governing body."

The regulation which the Secretary promulgated, 42 C.F.R. § 122.109(d), quoted *supra* at pp. 1237–1238, in no way conflicts with section 1512(b)(3)(A) until the "Provided" clause of that regulation is reached. In that clause, however, the Secretary has reserved to an HSA, which is a public regional planning body or single unit of general local government, only procedural hegemony along with the "opportunity to comment on any action proposed by the governing body in the performance of its functions." Thus, that provision, in the absence of any explanation by the Secretary of his own intentions, seemingly excludes by its silence any other control over the "governing body" by such an HSA. That the Secretary indeed so specifically intended is made clear by the position of his counsel in this case.

The Secretary does not cite any legislative history contrary to that reviewed *supra*. Rather, he relies on the "plain meaning" of the statute and seemingly also on the following paragraph in S.Rep.No.93–1285, 93d Cong., 2d Sess. 45 (1974), reprinted in 1974 U.S.Code Cong. & Admin.News, pp. 7842, 7884:

A newly formed public health planning entity must, in order to conform to the requirements of the legislation, have a planning area identical to the health area established under the proposed legislation, and provide for an *independent governing body* established in accordance with the requirements of Section 1412(b)(4), which has exclusive authority to perform the functions of a health planning agency. [Emphasis added.]

That Senate Report, however, preceded both the conference version of the bill and the colloquies quoted *supra*. In addition, the Senate Report related to a bill, which included section 1412(b)(1). That section read, in pertinent part:

(b) Legal Structure.—(1) A health planning agency for a health area shall—

\* \* \* \* \* \*

(B) if it is a public entity, (i) provide, in addition to the governing body of the parent entity (if any), for a governing body for health planning established in accordance with paragraph (4), which body shall have exclusive authority to perform the functions described in section 1413, and (ii) have a planning area identical to the health area established under this part which it serves, and \* \* \*

S.Rep. 93–1285, *supra*, at 81, 1974 U.S.Code Cong. & Admin.News, p. 7917. The words "exclusive authority to perform the functions," as they appeared in that Senate version, are to be contrasted with the following words in the statute as enacted: "exclusive authority to perform *for the agency* the functions" (emphasis supplied). What the Conference Committee did was specifically to qualify the phrase "exclusive authority to perform" by inserting the words "for the agency" before the words "the functions."

The Secretary was aware of that legislative history and of the possible conflict engendered by his interpretation of section 1512(b)(3)(A) before he finally promulgated the regulation which became 42 C.F.R. § 122.109(d). *See* 41 Fed.Reg. 12812 (1976) for the commentary accompanying the publication of regulations, which includes the following:

*Preamble.* A number of comments were received concerning the statement in the preamble to the proposed regulations discussing the relationship between the governing board of a public agency (i. e., public regional planning body or unit of general local government) which has been designated as a health systems agency and its "separate governing body for health planning" required by section 1512(b)(3) of the Act. A number of commentors indicated that that statement went further than the statute in permitting the exercise of authority by the governing board over the governing body for health planning, while others have ar-

gued that the relationship there described did not permit the governing board enough authority, especially in light of certain colloquies which occurred in both Houses of the Congress prior to the passage of P.L. 93–641.

With regard to the relationship between the regular governing board and the separate governing body, the Secretary wishes to express concern that these regulations will engender disabling conflict. Elected officials have also expressed the view that the arrangement called for is certain to cause such conflict, and the Secretary shares this view. However, as stated in the preamble to the proposed rulemaking, the relationship between the regular governing board and the governing body for health planning must be governed as a matter of law by the provisions of section 1512(b)(3) of the Act, which are reflected in § 122.109(d) of the notice of proposed rulemaking.

The Secretary is writing a letter to Congress expressing his concern over the potential conflict between the regular governing board and separate governing body for health planning and advising that he would support an appropriate legislative amendment which would remove this conflict.

■ Seemingly, the Secretary believed that his interpretation of section 1512(b)(3)(A) was the only one possible, given the language of the Act, and could only be altered through new legislation. *Id.* However, in this Court's opinion, the language of the statute did not require the Secretary to read it as he did. Indeed, in the light of the language and the legislative history of the statute, the statute does not permit the reading the Secretary gave to it. In sum, the Secretary's interpretation was mistaken and cannot withstand the challenge asserted herein by Montgomery County. Accordingly, summary judgment will be granted in favor of the plaintiff with respect to its challenge to 42 C.F.R. § 102.-109(d) to the extent to which that regulation deprives an HSA which is a public regional planning body or a unit of general local government of its authority to control

the "governing body" which exercises "exclusive authority" in the performance of its "functions" described in section 1513. An appropriate decree shall without delay be presented to this Court by Montgomery County, after submission for comment to the Secretary, appropriately requiring that effect be given to that holding by this Court.

### C.

Plaintiff seems to assert that there is no statutory basis for the requirement of 42 C.F.R. § 122.107(c)(11) which requires the comprehensive regional planning agencies or general local purpose governments to conform their plans and policies to the plans, AIPs and HSPs, of the HSAs. That section of the regulations reads:

(11) The agency shall coordinate its activities and seek to enter into a written agreement with each A–95 Agency whose area of responsibility is in whole or in part in the agency's health service area, for the purpose of achieving coordination of their respective activities and which shall, at a minimum, contain the following:

(i) Provision for organizational and procedural arrangements for coordination of plan development;

(ii) Provision for formal arrangements for review of health and health-related matters subject to review to assure concurrent and complementary actions;

(iii) Provision for technical assistance to be made available by the agency to the A–95 Agency and by the A–95 Agency to the agency;

(iv) Provision to assure that actions taken by the A–95 Agency which alter the area's health system will be taken in a manner which is consistent with the HSP and the AIP in effect for the area; and that actions taken by the agency take into consideration the general plans for the A–95 Agency; and

(v) Provision for sharing of data and information needed for planning activities.

Such agreements shall be reviewed periodically and revised as necessary.

An A–95 agency is defined as an "areawide planning and development clearinghouse established under Title IV of the Intergovernmental Cooperation Act of 1968." 42 C.F.R. § 122.1(b).

The language of 42 C.F.R. § 122.-107(c)(11), with respect to the cooperation of local agencies, tracks, at least in part, the wording of the statute:

(d) Each health systems agency shall coordinate its activities with—

(1) each Professional Standards Review Organization (designated under section 1152 of the Social Security Act),

(2) entities referred to in paragraphs (1) and (2) of section 204(a) of the Demonstration Cities and Metropolitan Development Act of 1966 and regional and local entities the views of which are required to be considered under regulations prescribed under section 403 of the Intergovernmental Cooperation Act of 1968 to carry out section 401(b) of such Act.

(3) other appropriate general or special purpose regional planning or administrative agencies, and

(4) any other appropriate entity, in the health system agency's health service area. The agency shall, as appropriate, secure data from them for use in the agency's planning and development activities, enter into agreements with them which will assure that actions taken by such entities which alter the area's health system will be taken in a manner which is consistent with the HSP and the AIP in effect for the area, and, to the extent practicable, provide technical assistance to such entities.

Section 1513(d) of the Act (42 U.S.C. § 300*l*–2(d)).

The Senate Report on the Act indicates a desire to promote coordination between the HSAs and existing planning agencies:

*Coordination among governmental entities.*—The Committee is concerned about the proliferation of Federal, State, and local planning areas and agencies. For that reason, the Committee bill contains language directing each of the planning agencies to coordinate its activities with each PSRO agency, entities designated under Section 1152 of the Social Security Act, entities established by OMB circular A–95, as well as State and any other appropriate health entities in the health planning agency's health area. The Committee hopes such cooperation will avoid duplication of effort and facilitate implementation of health plans. The agency is directed to secure data, where appropriate, from such agencies for use in its planning and development activities. S.Rep. No. 93–1285, 93d Cong., 2d Sess. (1974), 1974 U.S.Code Cong. & Admin.News, pp. 7842, 7889.

Thus, the challenged regulation seems to be within the letter and intent of the statute and must stand or fall with the statute itself.

### III. GUARANTY CLAUSE

Plaintiff asserts that the Act violates the federal Constitution's Guaranty Clause. That clause provides:

The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

U.S.Const. art. IV, § 4.

The County asserts that the Act creates a decisionmaking process pursuant to which the Secretary is authorized to designate and select entities which are not accountable to the local governing bodies.

In *Baker v. Carr,* 369 U.S. 186, 217–27, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961), Mr. Justice Brennan, on behalf of the majority, indicated that Guaranty Clause claims were both "political" and "nonjusticiable." Subsequently, in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), Mr. Chief Justice Warren wrote in the majority opinion that "[a]s we stated in *Baker v. Carr, some* questions raised under the Guaranty Clause are non-justiciable, where 'po-

litical' in nature and where there is a clear absence of judicially manageable standards." (377 U.S. at 582, 84 S.Ct. at 1392; emphasis added). It is to be noted that enforcement of the Guaranty Clause is not expressly committed by the Constitution to either the Congress or the President. Perhaps some Guaranty Clause claims may present justiciable issues.[9] But in this case, the Guaranty Clause attack goes to the heart of the power of the federal Congress to intermesh the working relationships of federal, state and local governments and private persons and agencies. On its face, the Act in question hardly seems to approach a denigration of republican government.

██ No standards for judicial enforcement of the Guaranty Clause have been established to date. Nor has plaintiff cited any case nor does this Court know of any case in which a court has relied on the clause to strike down an Act of Congress.[10] Under the circumstances, plaintiff may not prevail herein upon its Guaranty Clause contention.

## IV. TENTH AMENDMENT

Montgomery County argues that the Act deprives state and local governments of any real responsibility or control over planning and regulation of local health services and thereby offends the Tenth Amendment. The County contends that the HSAs or their governing bodies are unaccountable to local citizens and that the AIPs and HSPs which are developed by the autonomous HSAs and SHCCs control virtually all health services and facilities in a given area.

The County also contends that with their power to approve or disapprove (a) applications for federal grants (subject only to the Secretary's limited authority of overriding disapproval of a grant under extraordinary circumstances, the exercise of which the Secretary must justify in each instance), (b) applications for certificates of need, and (c) the appropriateness of existing and new institutional health services, the HSAs and SHCCs have unprecedented authority to regulate that which has, prior to the enactment of the Act, been subject to local and state supervision.

### A.

The Tenth Amendment reads as follows:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

The courts have consistently held that federal legislation which induces the states to act in a particular way by the promise of federal funds does not offend the Tenth Amendment.

In *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), two suits were brought challenging the constitutionality of the federal Maternity Act, which provided financial assistance to the states

---

**9.** *See Kohler v. Tugwell*, 292 F.Supp. 978 (E.D. La.1968) (three-judge court), *aff'd without opinion*, 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969), for the differing views of Judges Wisdom and Rubin. *See also Brown v. EPA*, 521 F.2d 827, 840 (9th Cir. 1975), *vacated on other grounds*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977).

**10.** In *Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975), *vacated on other grounds*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), California challenged the power of the EPA to impose sanctions on the state or its officials for failure to comply with the EPA Administrator's regulations under the Clean Air Act. The state challenged the regulations under both the Tenth Amendment and the Guaranty Clause. The Ninth Circuit held that the Clean Air Act did not grant the Administrator the power in question. The Court accordingly was not required specifically to determine the Guaranty Clause claim.

In most of the relatively few cases in which the Guaranty Clause has been invoked, the Clause has been asserted as a basis for stating a challenge to state laws or activities, rather than to federal actions. *See, e. g., Cochran v. Louisiana Board of Education*, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930); *Cantor v. Supreme Court of Pennsylvania*, 353 F.Supp. 1307, 1315–16 (E.D.Pa.), *aff'd without opinion*, 487 F.2d 1394 (3d Cir. 1973); *Holshouser v. Scott*, 335 F.Supp. 928, 934 (M.D.N.C.1971) (three-judge court), *aff'd mem.*, 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972).

to combat maternal and infant mortality. That act also provided that, if funds were not properly expended in any state, payments could be withheld. The Court resolved the case on other grounds, but in dictum indicated that the statute passed muster under the Tenth Amendment:

First. The state of Massachusetts in its own behalf, in effect, complains that the act in question invades the local concerns of the state, and is a usurpation of power; viz., the power of local self-government reserved to the states.

Probably it would be sufficient to point out that the powers of the state are not invaded, since the statute imposes no obligation, but simply extends an option which the state is free to accept or reject. * * *

262 U.S. at 480, 43 S.Ct. at 598.

In *Steward Mach. Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), the Supreme Court upheld the validity of a federal tax imposed on employers by the Social Security Act. The Act provided that an employer could receive a tax credit of up to 90% of the federal levy for contributions to state unemployment funds meeting certain criteria. Among the criteria was a provision that funds received by the state unemployment fund were to be paid over to the Secretary of Treasury to the credit of a federally established unemployment trust fund. Mr. Justice Cardozo applied a two-part test to assess the statute with respect to the Tenth Amendment:

* * * There must be a showing in the first place that separated from the credit the revenue provisions are incapable of standing by themselves. There must be a showing in the second place that the tax and the credit in combination are weapons of coercion, destroying or impairing the autonomy of the states. * * *

301 U.S. at 586, 57 S.Ct. at 890. Proceeding immediately to the second prong, Mr. Justice Cardozo held that the federal act induced, but did not coerce, the states to establish unemployment funds.

Who then is coerced through the operation of this statute? * * * Not the state. Even now she does not offer a suggestion that in passing the unemployment law she was affected by duress. * * * For all that appears, she is satisfied with her choice, and would be sorely disappointed if it were now to be annulled. The difficulty with the petitioner's contention is that it confuses motive with coercion. * * * [E]very rebate from a tax when conditioned upon conduct is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such a doctrine is the acceptance of a philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems. The wisdom of the hypothesis has illustration in this case. Nothing in the case suggests the exertion of a power akin to undue influence, if we assume that such a concept can ever be applied with fitness to the relations between state and nation. * * *

*Id.* at 589–90, 57 S.Ct. at 892. The Court also held that the statute did not call for a surrender of powers essential to the quasi-sovereign existence of the states because, *inter alia*, the establishment of state unemployment funds and the payment of their funds over to a federal trust fund were based on state statutory consent which could be withdrawn. *Id.* at 593–98, 57 S.Ct. 883.

In a case decided the same day as *Steward*, *Helvering v. Davis*, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937), Mr. Justice Cardozo elaborated on the power of the Congress, under Article I, section 8 of the Constitution, to spend money in aid of the general welfare. That case involved a challenge to a special income tax on employees under the Social Security Act to support federal old-age benefits. The plaintiffs asserted that the statute amounted to an invasion of powers reserved to the states by the Tenth Amendment. The Court found that the legislation was well within the

power of the Congress under the General Welfare Clause and thus did not contravene the Tenth Amendment. Mr. Justice Cardozo wrote:

* * * A system of old age pensions has special dangers of its own, if put in force in one state and rejected in another. The existence of such a system is a bait to the needy and dependent elsewhere, encouraging them to migrate and seek a haven of repose. Only a power that is national can serve the interests of all.

Whether wisdom or unwisdom resides in the scheme of benefits set forth in title II, it is not for us to say. The answer to such inquiries must come from Congress, not the courts. Our concern here as often is with power, not with wisdom. Counsel for respondent has recalled to us the virtues of self-reliance and frugality. There is a possibility, he says, that aid from a paternal government may sap those sturdy virtues and breed a race of weaklings. If Massachusetts so believes and shapes her laws in that conviction, must her breed of sons be changed, he asks, because some other philosophy of government finds favor in the halls of Congress? But the answer is not doubtful. One might ask with equal reason whether the system of protective tariffs is to be set aside at will in one state or another whenever local policy prefers the rule of *laissez faire.* The issue is a closed one. It was fought out long ago. When money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the state. So the concept be not arbitrary, the locality must yield. Constitution, Art. 6, cl. 2.

301 U.S. at 644–45, 57 S.Ct. at 910. (footnote omitted).

*Oklahoma v. United States Civil Service Commission,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), involved a challenge to section 12 of the Hatch Act, which provided that no state officer who was employed in connection with any federally financed activity could take active part in political management or campaigns. In any instance in which a politically involved state official was allowed to remain in his state position after the state had been notified of the violation, the Hatch Act authorized the federal government to withhold funds from the relevant state agency equivalent to two years' compensation of the politically involved official. In the *Oklahoma* case, the Civil Service Commission advised the removal of a state highway commissioner who was chairman of the Democratic state committee and who had helped supervise a political dinner. In challenging the Commission's action in the Supreme Court, the state argued that the penalty provisions of the Hatch Act violated the Tenth Amendment by invading the sovereignty of the state. The Supreme Court, in rejecting that contention, observed that "the Tenth Amendment has been consistently construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adopted to the permitted end.'" 330 U.S. at 143, 67 S.Ct. at 553, *quoting United States v. Darby,* 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609 (1940). The state's decision not to remove the highway commissioner from office belied any assertion of coercion. As Mr. Justice Reed explained:

* * * We do not see any violation of the state's sovereignty in the hearing or order. Oklahoma adopted the 'simple expedient' of not yielding to what she urges is federal coercion. Compare *Massachusetts v. Mellon,* 262 U.S. 447, 482 [43 S.Ct. 597, 67 L.Ed. 1078]. The offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual.

330 U.S. at 143–44, 67 S.Ct. at 554 (footnote omitted).

More recently, in *Arizona Dept. of Public Welfare v. HEW,* 449 F.2d 456 (9th Cir. 1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972), a state challenged certain provisions of the federal grant-in-aid program to states for assistance to needy individuals and families. To receive the grants-in-aid, a state was re

quired to formulate a plan for administering financial assistance, which had to be approved by the Secretary of HEW. Under the federal statute, the state plans had to fulfill certain requirements and be free of certain proscribed conditions in order for the state to be eligible for the program. Arizona's plan was determined to be out of conformity with federal requirements and its participation in the federal program was terminated. The state challenged the validity of several of the regulations which prescribed the plan requirements. The Ninth Circuit held that the federal regulations neither exceeded the agency's statutory authority nor unduly infringed the state's power to tailor its own assistance programs. One of the challenged regulations, which is of particular relevance to the case before this Court, required states to establish state-level "advisory committees" to help develop policy with respect to the assistance programs. Arizona argued that the advisory committee requirement "makes a sham of the State's power to create its own offices in derogation of the Tenth Amendment." Citing the *Oklahoma* case and noting that the federal statute had been enacted under the authority of the General Welfare Clause, Judge Duniway termed the state's contention "frivolous." *See* 449 F.2d at 473.

In *Vermont v. Brinegar*, 379 F.Supp. 606 (D.Vt.1974), the state challenged the decision of the Secretary of Transportation to withhold federal highway funds because of the state's failure to conform to certain federal requirements. Under the federal Highway Beautification Act of 1965, states were given the primary task of providing for effective control over outdoor advertising. If a state did not make provision for such control, federal aid funds to the state's highways could be cut by ten percent. "Effective control," according to the Secretary's interpretation of the statute, included payment of just compensation upon removal of certain types of signs. The federal government was to contribute to such "just compensation" by furnishing 75 percent of the cost of removal of signs. The state of Vermont maintained that it could, under its

police power, remove signs without paying compensation. The Secretary of Transportation responded by withholding the ten percent penalty provided in the Act.

Judge Coffrin affirmed the Secretary's interpretation of the Act and also held that the Act did not contravene the Tenth Amendment. Following *Darby, Oklahoma,* and *Steward Machine,* Judge Coffrin applied a two-part test to construe the Act's constitutionality under the Tenth Amendment:

1. Is the measure under attack reasonably related to a legitimately national end and, if so,

2. Does the challenged enactment coerce the state into participating in the federal scheme or does it merely induce the state to act?

379 F.Supp. at 616. Judge Coffrin concluded that control of outdoor advertising coupled with compensation of signowners was a legitimately national end. As to the second prong of the test, Judge Coffrin held that the mandated reduction in federal funds was best characterized as an "inducement":

With regard to any possible coercion of the state, the penalty which a non-complying state suffers is 10 percent of its Federal-aid highway funds. Although in absolute terms, this 10 percent reduction may constitute a considerable sum of money under certain circumstances, when considered in relation to a state's entire allocation of Federal highway aid, we cannot say that it irresistibly compels a state under threat of economic catastrophe to embrace the federal plan. Furthermore, any potential duress in paying just compensation as a component of effective control under penalty of a 10 percent fund cut is ameliorated by the 75 percent federal contribution to the cost of justly compensating signowners provided for in Subsection (g) of Section 131. Clearly the 10 percent penalty is an inducement for the states to satisfy the requirements of the Highway Beautification Act of 1965, but we do not believe that the rights of a state reserved to it by

the Tenth Amendment have been impermissibly invaded by this inducement. *Id.* at 617.

### B.

The legislation challenged in the case before this Court withstands attack under the Tenth Amendment standards developed in the case law. First, the National Health Planning and Resources Development Act of 1974 serves a legitimate national end. The Act is an attempt to achieve more efficient and equitable organization, supply and distribution of health resources through coordinated planning. *See* 42 U.S.C. §§ 300k, 300k–1, 300k–2; S.Rep.No.93–1285, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News, pp. 7842, 7878–79; *cf. Association of American Physicians and Surgeons v. Weinberger,* 395 F.Supp. 125, 128–34, 140–41 (N.D.Ill.) (three-judge court), *aff'd mem.,* 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1975) (legislation establishing Professional Standards Review Organizations with the intent of reducing unnecessary health expenditures was a valid exercise by the Congress of its powers). Although neither the Act nor its legislative history appears to invoke specifically the Congress' power under the General Welfare Clause, the Act is well within the authority granted by that provision of the Constitution. *See Goodin v. Oklahoma,* 436 F.Supp. 583, 586 (W.D. Okl.1977) (three-judge court) (holding the Act under attack in this case valid under the General Welfare Clause); *cf. Usery v. Charleston County School District,* 558 F.2d 1169, 1171 (4th Cir. 1977) ("Our duty in passing on the constitutionality of legislation is to determine whether Congress had the authority to adopt the legislation, not whether it correctly guessed the source of that power.").

The second part of the test stated in *Brinegar* raises the question of whether the Act coerces states into surrendering any aspect of their quasi-sovereign status. Under the structure of the Act, a state which balks at participation in the federal health planning program suffers no sanction other than loss of certain federal grants which must be approved by local HSAs. *See* 42 U.S.C. § 300*l*–2(e). It is well established that "unless barred by some controlling constitutional prohibition" the federal government may attach terms and conditions to its grants of financial assistance to the states. *King v. Smith,* 392 U.S. 309, 333 n.34, 88 S.Ct. 2128, 2141, 20 L.Ed.2d 1118 (1968); *see also Lau v. Nichols,* 414 U.S. 563, 569, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The Act imposes no civil or criminal penalties on such states or their officials. While the withholding of federal funds in some instances may resemble the imposition of civil or criminal penalties and while economic pressure may threaten such havoc to a state's well-being as to cause the federal legislation to cross the line which divides inducement from coercion, that line is not crossed in this case. Nor does the Act displace local initiative with federal directives. The Act mandates essentially a cooperative venture among the federal government and state and local authorities. It erects a health planning apparatus in which national guidelines are applied at the local level through newly created agencies manned by area residents, some or many of whom will be local elected officials. The Act appears carefully drawn to disperse widely the authority over health planning.

Thus, the Act survives scrutiny under the Tenth Amendment.

### C.

Two recent cases that may appear to be contrary to that conclusion and to support plaintiff's position are distinguishable. In *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that amendments to the Fair Labor Standards Act (FLSA) which extended its wage and hour provisions to employees of state and local governments exceeded the Congress' power under the Commerce Clause. While the decision in *National League of Cities* was based primarily on the breadth of the Congress' power under the Commerce Clause, the Supreme Court referred to the Tenth

Amendment as an explicit limitation on that power. Mr. Justice Rehnquist, in his majority opinion for the Court, quoted the Court's previous characterization of the Amendment in *Fry v. United States*, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1796, 44 L.Ed.2d 363 (1975): "The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *See* 426 U.S. at 842–43, 96 S.Ct. 2465. Mr. Justice Rehnquist discussed in detail how the FLSA amendments acted to replace state and local choices with those made by the Congress, *id.* at 848–52, 96 S.Ct. 2465, and held that "insofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3," *id.* at 852, 96 S.Ct. at 2474 (footnote omitted). Mr. Justice Rehnquist, however, carefully confined the holding in *National League of Cities* to the Commerce Clause. In a footnote, he cautioned:

> We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state government by exercising authority granted it under other sections of the Constitution such as the Spending Power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment.

*Id.* at 852 n.17, 96 S.Ct. at 2474.

In two cases involving congressional action under section 5 of the Fourteenth Amendment, the Fourth Circuit has interpreted *National League of Cities* as a Commerce Clause case. *See Arritt v. Grisell*, 567 F.2d 1267, 1269–71 (4th Cir. 1977) (upholding provisions of Age Discrimination in Employment Act); *Usery v. Charleston County School District*, 558 F.2d 1169, 1170 & n.9 (4th Cir. 1977) (upholding Equal Pay Act). Whether an act passed under the authority of the General Welfare Clause should be subject to the same constraints as legislation under the Commerce Clause or only to those which apply to enactments under the Fourteenth Amendment is an open question.[11] Assuming, *arguendo* only, that the legislation at issue in this case was enacted pursuant to the Commerce Clause, that legislation, even measured by the standards of *National League of Cities* and *Fry*, does not violate the Tenth Amendment. As detailed at p. 1247 *supra*, the Act neither impairs the integrity of the states nor unduly restricts the freedom of the states to structure their health care functions. In *City of Macon v. Marshall*, 439 F.Supp. 1209 (M.D.Ga.1977), the Court reached a similar conclusion with respect to the federal Urban Mass Transportation Act (UMTA). Under the UMTA, states and municipalities which take over private transit lines must preserve the collective bargaining rights of transit employees in order to receive financial assistance under the Act. Holding that the UMTA did not contravene the Tenth Amendment, the Court distinguished the case from *National League of Cities*:

> Unlike the amendment to the minimum wage laws which included States and political subdivisions as employers under the minimum wage laws and thereby required State and political subdivisions to pay their employees a congressionally determined minimum wage and comply with the many other federal requirements, the Urban Mass Transportation Act does not directly require or command anything of States or their political subdivisions. Neither States nor political subdivisions are compelled to participate in

---

**11.** A comparison of the language of the three constitutional provisions is instructive. The Commerce Clause, Art. I, § 8, cl. 3, which authorizes Congress to regulate *interstate*, as opposed to intrastate, commerce, appears to grant powers less broadly than does either of the General Welfare Clause or the Fourteenth Amendment. The Fourteenth Amendment, which expressly tells the states what not to do, appears to grant the most expansive power to the Congress and appears the least fettered by the concerns of the Tenth Amendment. The scope of the Congress' power under the General Welfare Clause, Art. I, § 8, cl. 1, which contains no mention of the states, may be less than that of the Fourteenth Amendment, yet seemingly greater than that of the Commerce Clause.

the grand federal scheme created by the Act and thereby receive federal money. The participation is purely at their option. It is because of this that Macon is not now participating—it has elected not to.

439 F.Supp. at 1217.

The second case that possibly favors plaintiff's position, *Maryland v. EPA*, 530 F.2d 215 (4th Cir. 1975), *vacated on other grounds sub nom. EPA v. Brown*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), involved consolidation of a number of suits challenging EPA regulations issued pursuant to the Clean Air Act. After rejecting part of a transportation plan submitted by Maryland pursuant to that Act, the EPA directed the state to enact certain types of legislation to correct the plan's perceived inadequacies. The state was subject to civil and criminal penalties if it failed to comply with the EPA's directive. Judge Widener, writing for the Court, indicated disapproval of the federal agency's actions. He stated:

> If the national legislature may not revise, negative or annul a law of a state legislature, how an Act of Congress may be construed to permit an agency of the United States to direct a state legislature to legislate is difficult to understand.

530 F.2d at 225. Although the Court voiced Tenth Amendment concerns for the state's sovereignty, its opinion rested primarily on the breadth of the Congress' power under the Commerce Clause. The Court distinguished the situation before it from instances in which the federal government had induced the states to act through economic pressure.

> It should be noted that many forms of pressure on the states have been held not to violate those rights reserved by the Tenth Amendment, and none of them have been included in this statute. The alternative whip of economic pressure and seductive favor was approved in *Steward Machine Co. v. Davis*, 301 U.S. 548, [57 S.Ct. 883, 81 L.Ed. 1279] (1937) (unemployment tax); *Oklahoma v. Civil Service Comm'n*, 330 U.S. 127, [67 S.Ct. 544, 91 L.Ed. 794] (1937) (withholding of

highway funds conditioned on removal of a member of the highway commission of state); *Vermont v. Brinegar*, 379 F.Supp. 606 (D.Vt.1974) (highway funds withholding for non-compliance with Highway Beautification Act); and many other cases. Statutes are common which invite state regulation or administration in lieu of federal control, see 49 U.S.C. § 1671 et seq., on National Gas Pipeline Safety; or which withhold federal aid for failure to comply with federal standards, see P.L. 92–239, withholding federal approval of highway projects for states which have a speed limit of more than 55 m. p. h.; or making federal grants for state plans invoking federal standards, Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. And it should be noted, as did the Fifth Circuit in *Texas v. EPA*, [499 F.2d 289] at 320, that no similar available administrative alternatives have been proposed by the EPA in this case. The EPA has simply construed the statute to suit its administrative convenience with a direction to Maryland to perform, leaving no alternative. Maryland could not, as Oklahoma did in *Oklahoma v. Civil Service Comm'n*, 330 U.S. 127, 143, [67 S.Ct. 544, 91 L.Ed. 794] (1946), 'adopt the "simple expedient" of not yielding.' Moreover, the statute itself, 42 U.S.C. § 1857h–5(b)(2), provides that Maryland must litigate now or forfeit the defense later.

*Id.* at 228. As a matter of statutory construction, the Court held that the Clean Air Act did not provide the EPA with authority to require Maryland to enact specific legislation.

Unlike the case before this Court, *Maryland v. EPA* involved federal directives which threatened the state with civil and criminal penalties. An instructive contrast to that case is *Natural Resources Defense Council, Inc. v. Costle*, 564 F.2d 573 (D.C. Cir. 1977). *Costle* involved amendments to the Federal Water Pollution Control Act, which were designed to combat water pollution through the cooperative planning of federal, state, and local authorities. The statutory structure was somewhat similar

to the Act involved in this case, especially in its reliance on the states and localities to determine the boundaries of planning areas and to formulate the waste treatment plans. The Court found no constitutional infirmity in the water pollution control statute: "[T]he Act contains no provision for the enforcement of any obligation that may be imposed upon a State . . . . In the absence of any provision for sanctions the EPA may of course employ the accepted and traditional means of gaining State compliance by withholding funds . . ., but that method of stimulation would not violate the Tenth Amendment." 564 F.2d at 580. *See also Florida v. Mathews,* 526 F.2d 319, 325–26 (5th Cir. 1976) (HEW regulation regarding composition of state nursing home licensing boards held to be a valid condition to receipt of federal funds under Medicaid statute).

It appears, then, that neither *National League of Cities* nor *Maryland v. EPA* supports Montgomery County's within Tenth Amendment challenge. Other parts of the 1974 Act, which parts are not herein involved, have been held constitutional in the face of Tenth Amendment attacks. *See North Carolina v. Califano,* 445 F.Supp. 532 (E.D.N.C.1977) (three-judge court);[12] *Goodin v. Oklahoma,* 436 F.Supp. 583 (W.D.Okl. 1977) (three-judge court). Both of those cases were concerned with section 1523(a)(4)(B) (42 U.S.C. § 300m–2(a)(4)(B)), which requires that the State Health Planning and Development Agency administer a state certificate of need program pursuant to which only institutional health services "found to be needed shall be offered or developed in the State." Both courts upheld the constitutionality of that provision under Tenth Amendment scrutiny. The Court in *North Carolina v. Califano* explained:

We perceive nothing unconstitutional either in the purposes of the Act or in the condition thereby attached to health grants made to the States under federal health programs. Without question Congress in making grants for health care to the States, should be vitally concerned with the efficient use of the funds it appropriated for that purpose. It had a perfect right to see that such funds did not cause unnecessary inflation in the cost of health costs to the individual patient. It certainly had the power to attach to its grants conditions designed to accomplish that end. * * *

It must be remembered that this Act is not compulsory on the State. Unlike the legislation faulted in *State of Maryland v. Environmental Protection Ag., supra,* 530 F.2d 215, it does not impose a mandatory requirement to enact legislation on the State; it gives to the states an *option* to enact such legislation and, in order to induce that enactment, offers financial assistance. Such legislation conforms to the pattern generally of federal grants to the state and is not "coercive" in the constitutional sense.

At 534, 535 (footnote omitted; emphasis in original). The state argued that, since the North Carolina Constitution forbade the operation of a state certificate of need program, the federal government was effectively coercing the state into altering its constitution. The Court rejected (at 535) that contention with the observation that, if it were valid, any state could thwart the conditions of a federal grant by changing its constitution.

In this case, the focus is upon those provisions of the Act regarding HSAs and local governments and not upon certificates of need. However, there appears no reason to deviate from the reasoning or holding of the Court in *North Carolina v. Califano.* Accordingly, summary judgment will be granted in favor of the defendant with respect to the constitutional issues.

---

**12.** A copy of that opinion has been placed in the court file in this case.